**Mr. and Mrs. J.L. ROGERS, etc.,**
**Plaintiffs-Appellants,**

v.

**David C. EVANS, Defendant,**

**Leland Q. Linahan, et al.,**
**Defendants-Appellees.**

**Mr. and Mrs. J.L. ROGERS, etc.,**
**Plaintiffs-Appellants,**

v.

**Vendya LEWIS, et al.,**
**Defendants-Appellees.**

**No. 85–8279.**

United States Court of Appeals, Eleventh Circuit.

June 30, 1986.

As Amended on Denial of Rehearing and Rehearing En Banc Sept. 15, 1986.

Don C. Keenan, David S. Bills, Atlanta, Ga., for plaintiffs-appellants.

W. Warren Plowden, Jr., Macon, Ga., for defendants-appellees.

Susan S. Cole, Mitchell P. House, Jr., Macon, Ga., for Smith.

Before RONEY and HATCHETT, Circuit Judges, and NICHOLS *, Senior Circuit Judge.

## CORRECTED

HATCHETT, Circuit Judge.

In this case, the appellees are prison officials, prison medical personnel, and prison guards and matrons sued on several theories following the death of the appellants' daughter in a Georgia prison. The district court dismissed from the action several appellees and granted summary judgment for the others. We affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

Linda Rogers was an inmate of the Georgia Women's Correctional Institute (GWCI) in Hardwick, Georgia. She died in a segregation cell nine days before her scheduled release. The coroner of Baldwin County, Georgia, ruled that she died by suicide.[1] The manner of death is alleged to be inconsistent with suicide because Rogers's neck had ligature marks that could have been caused by a person who was trying either to restrain her or to harm her.

---

* Honorable Philip Nichols, Jr., Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. The coroner's jury held that she died "from reflex cardiac arrest following ligature and the death was self-inflicted—suicide."

Rogers was transferred to GWCI from the DeKalb County Jail after the State Court of DeKalb County revoked her probation. She entered GWCI on September 5, 1978. From the time of her admission to GWCI, Rogers was identified as having psychological problems. First, the misdemeanors for which she was originally adjudicated were using abusive language, calling in false fire alarms, and sending ambulances to people's homes. Second, she was diagnosed in her admission session as expressing suicidal thoughts and was classified as a suicide risk.

As a result of emotional turmoil manifested soon after admission and in response to the request by the judge who revoked her probation, a correctional institute official referred Rogers for a psychiatric interview.

She took one machine-scored psychological test. The test indicated a tendency toward suicide and generated a programmed recommendation for referral to a suicide counseling program. No such program existed at GWCI.

After about a month of confinement, Rogers began receiving prescriptions from GWCI for medication. The first drugs prescribed were tranquilizers, such as Vistaril. She began reporting nausea and was treated with Percogesic until one of the doctors (Dr. Perez) prescribed a small dose of Thorazine for forty-eight hours for nausea and anxiety. This prescription was given during a consultation three days after Rogers was found in a bathroom with a blade she had removed from a disposable razor. This episode was classified as a suicide gesture.

On a later consultation, another doctor (Dr. Smith) prescribed Prolixin Decoanate. Dr. Smith based this prescription on the assumption that Dr. Perez had prescribed Thorazine for psychosis and on Dr. Smith's opinion that Rogers was psychotic. The day after receiving the drug, Rogers began to report dizziness, protrusion of her tongue from her mouth, inability to get her

tongue into her mouth, twitching of muscles around the mouth, and swallowing of the tongue.

Two days after Rogers received Prolixin Decoanate, her mother wrote her that it was a dangerous drug and that she should not take it. In addition, a lawyer retained by Rogers's parents wrote the warden of the prison protesting subjection of Linda Rogers to "injections of Thorazine and possibly other toxic drugs." The letter invoked Rogers's right not to be subjected to cruel and unusual punishment, "regardless of whether it is disguised in the form of 'medical treatment.' "

After Dr. Smith learned of the letters, Rogers received no drugs except Vistaril and Cogentin. The Cogentin was prescribed to deal with continuing symptoms that could be interpreted as extrapyramidal side effects. Dr. Smith viewed the symptoms as evidence of a deepening psychosis. Among the symptoms were reports by Rogers that she could not use her hands, dizziness, lying in bed with her leg in the air, aching and twitching of her mouth, and protrusion of her tongue from her mouth. The primary treatment for these symptoms became placebos, consisting of injections of sterile water. On one occasion, Dr. Smith told the warden that placebos were preferable to Cogentin because Cogentin might cause Rogers to have "a more florid psychosis."

After learning of the letters from Rogers's mother and the lawyer, Dr. Smith began taking a witness with her on visits with Rogers. On the day she learned of the letters, Dr. Smith examined Rogers and wrote orders discontinuing medication and therapy. She noted in the medical records that medical treatment was being discontinued against medical advice and that the prognosis would be guarded.

During the last two weeks of Rogers's life, Rogers spent several days in the prison clinic. The possibility of placing Rogers

in Central State Hospital was discussed by the medical staff. Rogers opposed her transfer to the hospital on some occasions and was receptive on others. During her last five days, because of a disturbance she had created, she was confined to a segregation cell. Prison matrons and staff nurses observed her and she was seen once by a physician. She was not transferred to Central State Hospital.

Following the injection of Prolixin, Rogers during some periods appeared normal to observers. One matron observing while Rogers was in segregation reported that she appeared lifeless, standing at her door and moving only in slow motion. Many times Rogers screamed and cried for help while in segregation.

On February 13, at 8:25 A.M. and 9 A.M., Rogers told the matron that she could not get up from the floor. The matron believed she was faking. At 9:20 A.M., when the matron looked into the cell, Rogers was still on the floor. When the matron checked again at 9:35 A.M. to take Rogers to her shower, Rogers was dead.

### COURSE OF PROCEEDINGS

The parents of Linda Rogers filed suit against a number of Georgia officials and hospital employees alleging constitutional torts and medical malpractice. In a complaint filed on April 3, 1980, Mr. and Mrs. Rogers named nine defendants.[2] On January 20, 1981, Mr. and Mrs. Rogers filed a second complaint adding an additional twelve defendants.[3]

Until a judgment filed on March 21, 1985, dismissing all counts against every defendant except Lois Plummer, who did not move for summary judgment, the district court rendered individual rulings on several of the defendants. On March 2, 1982, the district court granted summary judgments for Dr. Regalado, Dr. Alcocer-Cetina, Mr. Spradlin, and Dr. Perez. On July 13, 1981, without objection from appellants, the district court dismissed the Georgia Department of Offender Rehabilitation from the action on the basis of lack of jurisdiction.

On July 16, 1981, the district court in an oral order dismissed all pendent claims of malpractice. In a later written order, however, the district judge rescinded the action because the statute of limitations had run on these claims. The district court deferred ruling on the pendent claims until ruling on motions for summary judgment.

The appellants offered affidavits by a psychiatrist to support the case against the various members of the medical staff. In an order on March 2, 1982, the district court granted Dr. Perez's motion to strike the affidavit as to him for failure to meet the requirements of rule 56(e). The affidavit did not specifically identify the records examined nor attach any copies. The order dismissing the counts against the four medical persons followed. On January 17, 1983, the district court responded to a motion by the appellants requesting that the court indicate whether it considered the psychiatrist's affidavit in dismissing the counts against Dr. Alcocer-Cetina. The district court acknowledged that only Dr. Perez had moved to strike the affidavit, but commented in the order that the affidavit's insufficiency existed regardless of which

---

**2.** In the April 3, 1980, complaint, Rogers's parents named the Georgia Department of Offender Rehabilitation doing business as Georgia Women's Correctional Institution, David C. Evans, commissioner of the Georgia Department of Offender Rehabilitation, Leland O. Linahan, warden of GWCI, Dr. Anita Rae Smith, Dr. Relando Alcocer-Cetina, Dr. Juan A. Perez, Lois Plummer (a matron), Joan Barksdale (a nurse), and Eloise Warren (a nurse).

**3.** The defendants in the January 20, 1981, complaint were Dr. Jacinto Regalado (psychiatrist), Vendya Lewis (assistant superintendent), Shirley Butts (staff nurse), Agnes Smith (staff nurse), Margaret Hooks (lieutenant), Raylene Bryan Williams (matron), Mack Daniels (correctional officer), Gary Lewis (correctional officer), "Jane" Purvis (first name unknown) (lieutenant), Michael Spradlin (employee), Ella West (matron), and Lillie Harper (matron). Shirley Butts and Raylene Williams were never served and did not file answers.

named appellee made the motion. The court denied the motion to strike the affidavit as untimely, but also stated that even considering the affidavit, the award of summary judgment in favor of Dr. Alcocer-Cetina was proper. The district court rejected the claims against the medical persons, finding that the argument at best stated a claim of negligence and not a claim of deliberate indifference.

In a March 21, 1985, pretrial conference, the district court on its own motion converted all motions for directed verdict into motions for summary judgment; it then granted the appellees' motions for summary judgment.

In their answers, all appellees raised a procedural objection to the qualification of Mr. and Mrs. Rogers as administrators of Linda Rogers's estate. Because the appellees did not cross appeal, this issue is not before us. *See Campbell v. Wainwright,* 726 F.2d 702 (11th Cir.1984) (non-appealing party may not diminish rights of opposing party under the judgment).

## APPELLANTS' LEGAL THEORIES

The Rogerses sued prison officials, medical staff, and line staff such as guards and auditors on a variety of theories. They sued the Commissioner of Corrections, David C. Evans, on the theory that he failed in his duties of supervision, care, and treatment of all inmates. The complaint alleged that GWCI did not have adequate facilities or competent staff to properly treat Rogers and did not maintain adequate medical records. The complaint alleged that Evans owed a duty to Rogers under Georgia law and knew or should have known of the acts and omissions that caused her death. During the proceedings in the district court, the appellants briefed specific omissions by administrators and supervisors in overseeing patient care. Among the allegations were failure to provide for psychiatric care except on a weekly consulting basis, violation of the standards of the Commission on Accreditation

for Corrections and the American Public Health Association, failing to keep medical records and in using non-board certified physicians, poor audit procedures that failed to discover that guards administered medicine at night, and failure to establish a procedure that ensured that prisoners would give informed consent to treatment.

The amended complaint also named Vendya Lewis and claimed liability against her on a supervisory theory. Lewis was responsible for establishing a system of psychiatric care for mentally ill inmates. The complaint alleged that she acquiesced to a system that did not require daily rounds by a psychiatrist and did not provide for examination of patients in the segregation/isolation area by a psychiatrist even when they had been identified as having psychiatric problems. The complaint also alleged that she failed to plan systems for maintaining proper records and for obtaining informed consent prior to giving inmates medication. Finally, the Rogerses named Michael Spradlin on a theory that as an auditor, he had personal knowledge of systemic deficiencies of the prison medical and psychiatric system, but relied on vague assurances from the prison administration after receiving complaints from Rogers's parents.

The theories against the individual physicians were primarily acts of gross incompetence, prescription of medication without adequate investigation, and failure to take actions to assist Rogers when her condition began to deteriorate.

The other appellees are matrons, correctional officers, registered nurses, and staff nurses who were allegedly aware of Rogers's situation but did not assist her.

The Rogerses alleged five causes of action. They alleged that taken individually and in their totality, the appellees' acts and omissions constituted violations of the Eighth and Fourteenth Amendments to the Constitution. They also alleged a violation of the duty under the Georgia Code to

protect Rogers against and prohibit the abuse or cruel treatment of her. They also alleged that the acts and omissions of Dr. Smith, Dr. Alcocer-Cetina, and Dr. Perez and nurses Barksdale and Warren constituted acts of medical malpractice under Georgia law. The Rogerses pleaded jurisdiction on a theory that the Georgia wrongful death statute applied to actions pursuant to 42 U.S.C. § 1981, *et seq.* In the appellate briefs, the Rogerses do not raise either the Georgia wrongful death statute theory or the alleged violations of duties owed to Linda Rogers by the prison administrators under the Georgia Code. We deem these theories to be abandoned.

The deprivation of life claim under the fourteenth amendment was alleged against all appellees on a theory of proximate causation.

### DISCUSSION

■ Deliberate indifference to serious medical needs of prisoners violates the eighth amendment prohibition of cruel and unusual punishment. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The indifference can be manifested by prison doctors in taking the easier and less efficacious route in treating an inmate. *Williams v. Vincent,* 508 F.2d 541 (2d Cir. 1974). If prison guards delay or deny access to medical care or intentionally interfere with treatment once prescribed, the eighth amendment is violated. *Estelle,* 429 U.S. at 104–05, 97 S.Ct. at 291–92. Medical treatment that is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness violates the eighth amendment. *Gittlemacker v. Prasse,* 428 F.2d 1, 6 (3rd Cir.1970).

■ Mere negligence or malpractice does not violate the eighth amendment. *Estelle* 429 U.S. at 106, 97 S.Ct. at 292. Medical care so inappropriate as to evi-

dence intentional maltreatment or a refusal to provide essential care violates the eighth amendment. *Green v. Carlson,* 581 F.2d 669, 675 (7th Cir.1978), *aff'd,* 446 U.S. 14, 100 S.Ct. 146, 64 L.Ed.2d 15 (1980). Whether an instance of medical misdiagnosis resulted from deliberate indifference or negligence is a factual question requiring exploration by expert witnesses. *Merritt v. Faulkner,* 697 F.2d 761, 765 (7th Cir. 1983).

■ Failure to provide basic psychiatric and mental health care states a claim of deliberate indifference to the serious medical needs of prisoners. *Hoptowit v. Ray,* 682 F.2d 1237, 1253 (9th Cir.1982).

■ *Supervisory Claims.* Even viewed in their most favorable light, the allegations against the supervisory personnel do not allege an eighth amendment violation. Section 1983 does not create vicarious liability. *Thompson v. Bass,* 616 F.2d 1259, 1268 (5th Cir.1980); *Baskin v. Parker,* 602 F.2d 1205, 1208 (5th Cir.1979).

The Rogerses do not allege that the prison totally ignored their daughter's plight. The facts thus do not resemble those jail cases where a complete lack of medical care raised an inference of rampant deficiencies due to callous indifference to the prisoner's need for medical care. *See e.g., Fielder v. Bosshard,* 590 F.2d 105, 109 (5th Cir.1979). The Rogerses allege that the prison should have met standards derived from model standards for good prison administration.[4] The Rogerses do not argue that these standards are identical to the eighth amendment constitutional standard.

■ In institutional level challenges to prison health care, systemic deficiencies can provide the basis for a finding of deliberate indifference. A series of incidents closely related in time may disclose a pattern of conduct amounting to deliberate

---

**4.** E.g., failure to provide for psychiatric care except on a weekly consulting basis, use of non-Board-certified physicians, inadequate record-keeping, and poor audit procedures that did not discover that at night guards administered medicine.

indifference. *Bishop v. Stoneman,* 508 F.2d 1224 (2d Cir.1974). Repeated examples of delayed or denied medical care may indicate a deliberate indifference by prison authorities to the suffering that results. *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir. 1977).

■ The Rogerses do not offer evidence that the administrators failed to make attempts to provide medical care to inmates in Rogers's situation or that a pattern of conduct indicates deliberate indifference. In addition, no evidence of callous conduct toward Rogers was presented. None of the supervisory appellees was alleged to have blocked access to medical care. The auditor, Spradlin, is simply too remote from the Rogers medical situation to fall under the *Estelle* deliberate indifference standard. Warden Linahan pleaded at one point with Dr. Smith to move Rogers to Central State Hospital because of the difficulty of handling her situation in the prison. Viewed in the most favorable light, the allegations against supervisory personnel only support an inference that the GWCI did not provide a desirable standard of medical care.

We hold that the district court correctly dismissed the complaints against Warden Linahan, Auditor Spradlin, and Assistant Superintendent Lewis.

■ *Non-Supervisory Non-Medical Defendants.* The allegations about the non-medical prison staff were made in general terms and with few facts to support them. The theory is that during Rogers's period of segregation, these appellees observed her deteriorating condition and failed to take adequate steps to treat it. But memoranda of facts submitted by the parties in compliance with the direction of the court at the pretrial conference reflect a record of efforts by untrained personnel to report Rogers's symptoms to medical staff and to keep records of her symptoms and behavior[5]. Nothing in the record sup-

ports a factual dispute about the motives of these low level staff, who acted upon their understanding of directions from the medical staff. No specific allegation has been pleaded against any of these personnel to support an inference of callous indifference for Rogers's welfare.

Ordinarily, summary judgment should not be granted in cases where motive, intent, subjective feelings, and reactions are to be searched. *Alabama Great Southern RR v. Louisville and Nashville RR,* 224 F.2d 1, 5 (5th Cir.1955). The Rogerses complain that the summary judgment was filed before they filed additional pleadings or discovery materials in opposition. In the order granting the summary judgment, however, the district court stated that all parties indicated that consideration of the motion for summary judgment based on what was in the file was satisfactory. The Rogerses did not file an affidavit under Rule 56(f), Federal Rules of Civil Procedure, showing facts essential to justify opposition to the motion. After "a full opportunity to muster all the evidence" they could, they did not place a material disputed fact before the district court. *See Jones v. Borden Co.,* 430 F.2d 568 (5th Cir.1970). Thus, the state of mind of these personnel was not at issue. We hold that the district court properly granted summary judgment as to the non-supervisory non-medical appellees.

*Medical Personnel.*

■ *Dr. Smith.* Dr. Anita Rae Smith provided services to patients under a contract as a consulting psychiatrist to the women's prison. During the time Rogers was at the women's unit, Dr. Smith performed her consulting services on three Monday nights per month for four hours each and on one Thursday afternoon each month for four hours, two of which were generally devoted to consultation with patients. She occasionally substituted for Dr. Juan Perez as a consulting psychiatrist at

---

**5.** The parties agreed at the pretrial conference    to submit written offers of proof of facts.

the women's prison, generally for four hours on Thursday mornings.

Dr. Smith has an institutional permit to provide psychiatric services. She is not a board certified physician; she took the federal licensing examination in 1970 and did not attain a passing score. She cannot recall whether she took it another time.

Dr. Smith had the greatest amount of contact with Linda Rogers of any of the physician appellees. The Rogerses have pointed to a number of acts or omission by Dr. Smith as evidence of deliberate indifference to Linda Rogers's needs. Dr. Smith replies that there is no disputed issue of material fact on which an *Estelle* violation could rest. She offers a number of arguments to refute each specific claim of indifference and contends that all of her actions can be accounted for as no more than negligence, limitations on her legal authority to administer treatment if Linda Rogers objected, and the lack of an affirmative obligation under her contract to monitor Linda Rogers's condition. Dr. Smith also denies that her acts are the proximate cause of Rogers's death.

Dr. Smith's arguments do not put to rest factual disputes about the medical basis for some of Dr. Smith's treatment of Linda Rogers, the extent to which she withdrew treatment from Rogers after the objection to the Prolixin Decoanate, and in general, Dr. Smith's subjective reasons for the level of care she provided Linda Rogers. Dr. Smith's arguments place her actions in a factual context and, as such, are appropriate matters for the trier of fact. "The issue is whether the questioned conduct is cruel and unusual because it involves deliberate indifference, or something more than a medical judgment call, an accident, or an inadvertent failure." *Murrell v. Bennett,* 615 F.2d 306, 310 n. 4 (5th Cir.1980).

Whether Dr. Smith's treatment was grossly incompetent is placed at issue in the psychiatric affidavit.[6] According to this affidavit, a diagnosis of Rogers as schizophrenic, schizo-effective type was so wide of the mark as to be far below the minimum standards of medical care, and no psychiatric or medical basis exists for the prescription of a placebo for Rogers's symptoms. The affidavit also alleges that Prolixin Decoanate is an extremely potent tranquilizer that should not be used on a patient without first testing the patient's reaction to lower dose, shorter acting tranquilizers.

In every in-person contact between Dr. Smith and Rogers after the objections to the medication, Dr. Smith obtained the presence of a third party to act as witness.[7] Dr. Smith's contact with Rogers ended after February 8, 1979. Dr. Smith offers the referral system at the prison as an explanation; she did not receive any requests to treat Rogers except for Linahan's request to transfer Rogers. Dr. Smith describes the warden's request as having been based upon his view of Rogers as a discipline problem. Dr. Smith says that she assumed Rogers was being closely observed and that medical help would be requested from Dr. Alcocer-Cetina, who was the attending physician, or Dr. Perez, who had a contract to provide emergency services, or herself. She acknowledges that she knew that she or Dr. Perez were the only sources of psy-

---

**6.** Although the district court struck the affidavit by Dr. Leonard Goldstein as to one defendant and expressly disapproved of it as to Dr. Smith, the district court did not strike the affidavit as to Dr. Smith. It is in the record. We assume that the district court took account of the affidavit and we do also. Our disposition as to Dr. Smith, however, rests on factual disputes in addition to those in the affidavit. See footnote 10 for a discussion of the district court's use of the Goldstein affidavit as to Dr. Alcocer-Cetina.

**7.** Dr. Smith: "I felt, in view of those notes [from Rogers's mother and lawyer], that perhaps I should have someone with me as a witness as to what did go on between me and Linda Rogers since there was pending litigation about my treatment of her." Smith deposition, p. 69.

chiatric assistance to inmates in the segregation unit.

A jury could reasonably find that Dr. Smith's contact with Rogers began to decrease after the expression of opposition by Rogers and her parents to the drug treatment, but concurrently with the deterioration of Rogers's condition. A jury could also reasonably find that Dr. Smith has not presented evidence demonstrating that the prison referral system is a sufficient explanation for the lack of efforts to protect Rogers's welfare after she was placed in segregation.

Dr. Smith's plea that she was prevented from prescribing appropriate medication, if the medicine she wished to prescribe was egregiously inappropriate, cannot, for purposes of summary judgment, rebut an allegation that she failed to tender medical care. If she reacted to being prevented from providing inappropriate care by discontinuing efforts to provide medically defensible care, Dr. Smith may well have been "deliberately indifferent" within the meaning of *Estelle v. Gamble.*

The record reflects inconsistent explanations of why Linda Rogers was not placed in Central State Hospital. Dr. Smith maintains that "her hands were tied" because Linda Rogers did not want to go, but also reports expressions by Rogers of interest in going. Dr. Smith does not recall and does not deny that Warden Linahan told her that Rogers wanted to go to the hospital. Dr. Smith also wavers when describing what treatment Rogers opposed; Dr. Smith concedes that the opposition was to anti-psychotic medication, not to all forms of treatment. She also expresses impatience with Linda Rogers's on-again-off-again attitude toward entering the hospi-

tal.[8] A reasonable jury could find that impatience with a vacillating attitude by a mental patient cannot serve as a conclusion that the patient has refused all treatment. Dr. Smith's own testimony allows the inference that she treated Rogers's inconsistency as a flat and final "no." A jury would be entitled to judge whether Rogers refused to go to the hospital or Dr. Smith preferred to withdraw from involvement because of Rogers's and her parents' opposition to aspects of the treatment she had administered.

The record reflects confused impressions of whether Smith told prison officials and matrons that Rogers faked her symptoms. Dr. Smith denies that she would normally describe a patient as faking, but she does not recall what she said about Rogers. Dr. Smith describes exaggeration of side effects to medication as part of a patient's psychosis and in particular as part of Rogers's psychosis.

The record also reflects disputed facts of why Dr. Smith did not see Linda Rogers after February 8. Dr. Smith contends that as a consulting psychiatrist rather than an attending physician, she needed only to respond to requests. But she wavers in her deposition in describing why she did not see her on February 12.

The record thus contains disputes and differing inferences both about the extent of Dr. Smith's departure, if any, from professional standards and about whether she failed to provide treatment during a period in which she had an obligation to render care. If reasonable minds might differ on the inferences arising from undisputed facts, then a court should deny summary judgment. *Mercantile Bank and Trust v. Fidelity and Deposit Co.,* 750 F.2d 838 (11th Cir.1985).

---

**8.** Dr. Smith: "Now, if, indeed, Warden Linahan told me that she was asking to go, he and I both knew that Linda Rogers frequently asked to go—'I want to go to the hospital.' When I would see her and I'd offer it to her, 'No, I don't want to go to the hospital.' He and I were both well aware of that, because that was sort of a repeated pattern of hers. She'd say one moment she wanted to go. You'd go and you'd offer it to her and she'd say no. I think the medical record reflects this throughout."

Grossly incompetent or inadequate medical care can violate the eighth amendment. *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir.1970). Even if Dr. Smith provided a period of attentive, competent care to Rogers, one episode of gross conduct would be sufficient for a jury to make a finding of deliberate indifference. *"Gamble* does not necessarily excuse one episode of gross misconduct merely because the overall pattern reflects general attentiveness." *Murrell v. Bennett*, 615 F.2d 306, 310 n. 4 (5th Cir.1980).

We hold that summary judgment was not appropriate as to the eighth amendment allegations against Dr. Smith. The district court should now rule whether the fourteenth amendment claim for deprivation of life has any viability. Whether the acts and/or omissions of *Estelle* defendants are the proximate cause of an inmate's death have been placed before a jury on an eighth amendment claim even where a medical expert stated that the death was entirely unforeseeable. *Fielder v. Bosshard*, 590 F.2d 105, 110 n. 6 (5th Cir.1979). But whatever the disposition of the deprivation of life claim, theories about how Rogers met her death do not bear upon the separate claim that Rogers suffered cruel and unusual punishment during some portion of her confinement at GWCI. In light of the district court's decision to treat the pendent claims in the summary motion, we assume that the district court has the pendent claims before it.

To summarize, the evidence could permit an inference, independent of Rogers's death, that she suffered pain and extreme distress at least from the time the Prolixin was administered. Dr. Smith's allegations do not prove conclusively that the Rogerses do not have a cause of action but "in reali-

ty highlight the disputed factual issues." *Murrell*, 615 F.2d at 310. Whether the Prolixin was a matter of gross incompetence, negligence, or medical judgment is disputed and a proper subject of expert testimony. The credibility of Dr. Smith's account of her motives is relevant. Whether use of placebos as a treatment for Rogers's symptoms has any basis in medical knowledge is at issue. All these are triable issues, which the Rogerses are entitled to put before a jury and about which, in the relevant instances, expert testimony can be presented.

■ *Dr. Perez.* Dr. Perez submitted an affidavit in connection with his motion for summary judgment. The affidavit establishes that his contact with Rogers was limited. He saw her twice during his regular Thursday sessions. Most other times, Dr. Anita Rae Smith substituted for him. On September 21, 1978, Dr. Perez prescribed Vistaril 25 mg. two times per day as needed for nervousness. On January 11, 1979, he continued her on Elavil 75 mg. one per day and prescribed Thorazine 25 mg. one tablet three times daily for forty-eight hours for nausea and vomiting. Dr. Perez had no contact with Linda Rogers either in person or by receiving communications about her after January 11, 1979. He was on vacation from January 26, 1979, to February 12, 1979, and out of the country most of the time. We see nothing in the record that was offered by the Rogerses to place in dispute any material fact about Dr. Perez's conduct toward Linda Rogers.[9] The record does not reflect any testimony that would indicate a deliberate indifference to serious medical needs of Linda Rogers by Dr. Perez.

■ *Dr. Regalado.* Dr. Regalado saw Linda Rogers once when he was covering

---

**9.** The court granted a motion to strike an affidavit of Leonard Goldstein concerning Dr. Perez's treatment of Linda Rogers. This action was proper. The affidavit is phrased in conclusory terms without citing facts. Dr. Goldstein states that Dr. Perez knew or should have known of deficiencies in the care and diagnosis of Linda Rogers. The opinion is only stated provisionally. The affidavit is defective to create a factual dispute.

for Dr. Perez on February 7, 1979. He spent approximately twenty-five to thirty minutes with Rogers and did a gross neurological and psychiatric evaluation. He observed her to be quiet, cooperative, and in good contact with reality. She was not staggering and her facial muscles were normal. At her request, he gave her a prescription for Vistaril for two days and suggested she be evaluated by Dr. Smith the next day. Dr. Regalado did not observe side effects of Prolixin and Rogers did not complain of any at the time he saw her.

On the basis of these facts, there is no genuine material fact in dispute about Dr. Regalado's treatment or state of mind toward Rogers. An affidavit by Dr. Goldstein concerning Dr. Regalado's contact with Rogers was not struck from the record. The allegations, however, describe negligence. The affidavit states that Dr. Regalado should have examined Rogers for cogwheel rigidity and should have had a high index of suspicion of a drug reaction. The conclusions—that Dr. Regalado's acts and omissions "may have contributed to the development of an untreated extrapyramidal reaction to Prolixin and to the development of panic, helplessness, and depression"—are speculative. The Rogerses have not put forward facts placing at issue whether Dr. Regalado acted in a deliberately indifferent manner toward Linda Rogers.

■ *Joan Barksdale, R.N., and Eloise Warren, R.N.*. In our review of the record we find no factual development of the allegations against these two nurses. We have examined the plaintiffs' memorandum of facts to determine whether the Rogerses put forth disputed facts about the conduct of these registered nurses. Although the plaintiffs' memorandum did not attempt to set forth all the evidence, it did undertake "to set forth that evidence which is sufficient to create questions of fact to be presented to a jury."

Nurse Barksdale is only mentioned four times. On October 18, she wrote a note in Linda Rogers's medical record that Barksdale had notified Vendya Lewis of Dr. Smith's order to take Rogers out of the population and put her under observation. On February 4, 1979, Rogers told Barksdale, while in the clinic, that her muscles were twitching and her tongue was drooling. No allegation is made that Nurse Barksdale failed to act appropriately. The last two mentions of Nurse Barksdale describe her actions upon being called to Rogers's cell after she was discovered dead.

These facts establish only that Nurse Barksdale had contact with Rogers. They raise no disputed facts or inferences that could support an *Estelle* violation.

Nurse Warren is mentioned five times. As with Nurse Barksdale, these references establish only that Nurse Warren was present at GWCI and had contact with Rogers. In these contacts, she observed some of Rogers's symptoms. In the proffer of facts, however, the Rogerses do not allege that Warren failed to take action in response to the symptoms she observed. Indeed, the plaintiffs' memorandum does not describe in any fashion how Nurse Warren responded. This failure to place a material disputed fact before the district court after full discovery efforts made summary judgment appropriate. *See Jones*, 430 F.2d 568.

We affirm the grant of summary judgment as to all appellees except Dr. Anita Rae Smith. We hold that there are disputed issues of material fact under the standards of *Estelle v. Gamble* as to Dr. Smith and remand for proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.

RONEY, Circuit Judge, concurring:

I concur in Judge Hatchett's decision.

I concur in the reversal of summary judgment as to Dr. Smith with the recognition that the standard of proof required to establish liability against her is very high. The evidence and affidavits offered must be viewed most favorably to plaintiff on a summary judgment motion, however, and any possible liability from a favorable veiw of the evidence requires a fuller development of the case than permitted on summary judgment. Whether a reasonable view of the evidence and the live testimony of the affiants will meet the required standard must await trial. This is a close case but such cases should be decided against the foreclosure of further litigation by summary judgment.

NICHOLS, Senior Circuit Judge, concurring in part and dissenting in part:

I join in the decision of the court and in Judge Hatchett's carefully weighed opinion with respect to all defendants except Dr. Smith. Respectfully, I would affirm with respect to them also.

The plaintiffs cannot recover under the Federal Constitution for ordinary negligence. They must show cruel and unusual punishment predicated on a showing of deliberate indifference to an inmate's serious medical needs, *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The majority properly does not find the facts, but it discovers a triable issue of fact in the evidence submitted on the motions for summary judgment. Specifically, the court locates evidence that Dr. Smith deliberately distanced herself from the problem inmate Linda Rogers presented, which was within Smith's cognizance as consulting psychiatrist for the women's prison. It surmises that the withdrawal was a result of threats of litigation by the Rogers family, *i.e.*, present plaintiffs, and resistance by Linda Rogers—encouraged by her family— to the medication Dr. Smith thought best. Linda was also allowed, until too late, to prevail in her intermittent resistance to being taken to the state mental hospital where her problems would have received continuous skilled attention.

One must sympathize with Dr. Smith, threatened with no doubt astronomical money damages if she meted out to Linda Rogers the treatment she thought right, and with likewise astronomical money damages if she yielded to Linda's objections, or those made by her family on her behalf. There may, of course, be arrangements in place for the state, or an insurance company, to pay whatever is assessed, but we must assume otherwise if not told. The manifest tendency of the law as here applied would seem to be to make employment in the state's medical service, in its institutions, attractive only to those who are judgment proof.

To avoid making the dilemma worse than it already is, I would exclude from the remand any issue as to medical treatment withheld because of objections by Linda herself, her family, or her attorneys, whether drugs or physical transfer to the mental hospital. When competing alleged constitutional rights are at issue, state medical personnel should not be required to select the right ones to respect at their peril. Nor should a doctor be required to defend in federal courts his or her refraining from the imposition of medical care rejected by the patient. That is not, I submit, an *Estelle*-type case.

There is apparently no evidence that Linda was viewed as suffering a mental impairment so severe she was dangerous to herself or others. Her right to object to certain treatments therefore had to be respected, as it was. This is a complication the majority opinion nowhere addresses.

Should there be any sufficient evidence that Dr. Smith deliberately withheld any other needed medical care that Linda would have accepted, and her family not have sued on, I would not object to a remand confined to that.

Finally, the plaintiffs revealed to the court their suspicion that Linda was murdered. The suspect did not move for summary judgment and the case will continue as to her. Obviously if Linda was murdered, the case against the two doctors is much diminished, if viable at all. If there

is to be a trial as to the doctors' liability, it should be suspended until the murder issue is somehow disposed of.