[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14016
Non-Argument Calendar

_____

D.C. Docket No. 3:13-cv-00737-TJC-MCR

MOZELLE THOMAS, et al.,

Plaintiffs-Appellants,

versus

CITY OF JACKSONVILLE, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 23, 2018)

Before MARCUS, ROSENBAUM, and NEWSOM, Circuit Judges.

PER CURIAM:

Plaintiffs Mozelle Thomas and Jalynne Santiago appeal from the district

court's order granting Defendants' summary judgment motion on qualified-

immunity grounds.  Even viewing the facts in the light most favorable to Plaintiffs, we conclude that no genuine dispute of material fact exists.  We affirm.

**I**

In July 2010, officers of the Jacksonville Sheriff's Office arrested Javon Thomas for assault and interference with custody of a minor child.  Thomas received a physical examination upon his arrival and booking at the Jacksonville Pretrial Detention Facility, during which he expressly denied having any history of seizures.[1]

At approximately 7:00 a.m. the following morning, July 30, Corrections Officer ("CO") Randy Avery was concluding his patrol duties when "[he] was called back by CO Williams, who informed [him] that there was a medical emergency where an inmate was possibly having a seizure . . . ."  Avery followed Williams' direction to the cell in which the potential medical emergency was taking place, and, upon entering the cell, "saw inmate Javon Thomas sitting on the top bunk," "sweating profusely" with "mucous coming out of his nose and saliva coming out of his mouth."  Avery conveyed to Williams that a medical emergency was taking place, and at 7:07 a.m. the officers issued a "Signal 17" medical distress call.

---

[1] Thomas' mother, Karan Thomas, would later inform Jacksonville Sheriff's Office detectives that Javon had "had seizures in the past," the last of which occurred "about (1) year ago."

2

Multiple COs and medical personnel responded to the Signal 17, reporting to Thomas' cell in order to assist CO Avery. The responders found Thomas "sitting up on [the] top bunk, awake, but not following directions. [The] [o]fficers attempted to have [Thomas] come down off [the] bunk, but [he] became more aggressive. After [Thomas] was taken down off of [the] bunk, [he] jerked away and laid down on [the] bottom bunk on [his] stomach." Nurse Michelle Singleton then "attempted to obtain [Thomas'] [vital signs]," at which point Thomas "became extremely aggressive and combative," requiring the help of several officers to ensure "[Thomas'] own safety, [the officers'] safety, and [the safety] of medical personnel." Multiple responding officers described Thomas as agitated and combative, flailing his arms and kicking at the responders—at one point even attempting to bite an officer. Nurse Singleton determined that Thomas was neither seizing at the time nor "postictal" (*i.e.*, in a state indicating that he had just suffered a seizure) and speculated that "[p]ossible toxic ingestion" may have caused his erratic behavior.

The officers "ultimately decided that Thomas should be placed in a four-point restraint, meaning a physical restraint with both his hands and ankles cuffed and a chain connecting the two sets of cuffs." Once they restrained Thomas, the officers transported him via stretcher to the detention center's health clinic, where "Dr. Joshi ordered Nurse Singleton to administer to Thomas a shot of Zyprexa," a

3

drug often used as an "emergency treatment order for a person who is psychotic or acting psychotic." Shortly after receiving the shot, Thomas suffered a grand mal seizure and died while being transported to the nearest hospital. According to the Medical Examiner's Office, "[Thomas'] cause of death was ruled a seizure disorder of unknown etiology and the manner of death was ruled natural."

Plaintiffs Mozelle Thomas and Jalynne Santiago—personal representatives of Thomas' estate—filed their original complaint in the United States District Court for the Middle District of Florida. Following a series of motions and amendments, Plaintiffs eventually filed their fourth (and final) amended complaint in which they alleged several state-law violations as well as violations of Thomas' Fourth, Fifth, Eighth, and Fourteenth Amendment rights under a "deliberate indifference" theory—all against the City of Jacksonville (the "City"), Sheriff John Rutherford, and various COs and medical personnel in their individual capacities. Defendants moved for summary judgement following discovery, which the District Court granted. Plaintiffs timely appealed to this Court.

## II

We review *de novo* a district court's summary-judgment order based on qualified immunity, "applying the same legal standards as the district court." *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003). A district court properly grants summary judgment when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id*. (citing Fed. R. Civ. P. 56(c)). "As this Court has repeatedly stressed, the facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case. Nevertheless, for summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the plaintiff." *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) (internal quotation marks, citations omitted).

Taking the facts in the light most favorable to Plaintiffs does not, however, require that we presume the existence of a dispute that must go to trial; "the issue of fact must be 'genuine,'" which means that "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The nonmovant 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment.' If the nonmoving party's response to the summary judgment motion consists of nothing more than mere conclusory allegations, then the Court must enter summary judgment in the moving party's favor." *Johnson v. Fleet Finance, Inc.*, 4 F.3d 946, 949 (11th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

## III

The first step in our qualified-immunity framework requires that we determine whether Defendants were "acting within the scope of [their] discretionary authority." *Moore v. Pederson*, 806 F.3d 1036, 1042 (11th Cir. 2015). The term "discretionary authority" includes "'all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority.'" *Id.* (quoting *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)). Because it is "uncontested that the COs were acting within their discretionary authority," "the burden shifts to [the plaintiffs] to demonstrate that qualified immunity is inappropriate," *Moore*, 806 F.3d at 1042.

Plaintiffs must satisfy both elements of a two-pronged inquiry when contesting qualified immunity. "The first [prong] asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a [federal] right[.]'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201, (2001)). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation. Governmental actors are 'shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 1866 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

6

The evidence that Plaintiffs present to support their federal- and state-law claims is inadequate to demonstrate a constitutional violation—let alone a violation of a clearly established right—and Plaintiffs thus fall far short of surmounting Defendants' qualified-immunity defenses.  This section addresses Plaintiffs' claims in turn.

## A

Plaintiffs allege under 42 U.S.C. § 1983 that Defendants were deliberately indifferent to Thomas' medical needs, thus violating his constitutional rights.  A pretrial detainee's deliberate-indifference claims "[arise] under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment," but are nevertheless "subject to the same scrutiny as if they had been brought as deliberate indifference claims under the Eighth Amendment."  *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016) (quoting *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009)).  In order to prevail on a claim of deliberate indifference to a serious medical need, a plaintiff must show: "(1) a serious medical need; (2) a defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."  *Id.*

Defendants agree that Thomas exhibited a "serious medical need," and the parties thus focus the bulk of their briefing on the deliberate-indifference element itself.  This subcomponent of the broader claim also comprises a three-part inquiry,

requiring that a plaintiff show "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). In order to support their theory of deliberate indifference, Plaintiffs allege that Defendants "unreasonably delayed administering medical attention and treatment," and also that Defendants' use of the "four-point restraint" and their administration of Zyprexa were inappropriate. Br. of Appellant at 13, 15.

Plaintiffs' first allegation—that Defendants "unreasonably delayed" in their treatment of Thomas—lacks support in the record. "An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994). Plaintiffs provide no such evidence. Even setting aside this critical deficiency, Plaintiffs fail to provide evidence of any delay—much less an unreasonable one—between the time that Defendants learned of Thomas' ailment and the time they addressed it. Plaintiffs argue that "[t]he record indicates that Mr. Thomas had been complaining of trouble breathing the night before," Br. of Appellant at 13, but they cite no evidence supporting the contention that the COs

8

were made aware of Thomas' alleged complaints.[2]  Contrary to Plaintiffs'

conclusory allegation, nothing in the record suggests that Defendants delayed in

their response to Thomas' ailments.

Plaintiffs further argue that "even if the CO Defendants responded to the

initial signal 17, there was an improper delay of 45 minutes . . . ."  Reply Br. at 10.

Plaintiffs derive this argument from the tenuous inference that "Mr. Thomas' vitals

were not taken until 7:45 am . . . 45 minutes after the signal 17 was reported," *id.* at

12, and therefore that there was necessarily an "improper delay" in treating

Thomas.  Plaintiffs' conclusion simply doesn't follow.  First, the COs had

significant difficulty pacifying Thomas when they arrived in his cell (Plaintiffs

neither dispute nor address this), which presumably hindered the officers' ability to

make medical assessments.  But more importantly, Plaintiffs never explain how the

alleged delay harmed Thomas, and thus they fail to "establish the detrimental

effect of delay," an essential component of their claim.  *Hill*, 40 F.3d at 1188.

Plaintiffs' contentions regarding the four-point restraint and the Zyprexa

injection suffer similar fates.

> In our decisions, conduct deliberately indifferent to serious medical
> needs has included: (1) grossly inadequate care; (2) a decision to take
> an easier but less efficacious course of treatment; and (3) medical care

---

[2] As explained further below, the only evidence to which Plaintiffs cite to support this claim is inadmissible hearsay, and "[t]he general rule is that inadmissible hearsay 'cannot be considered on a motion for summary judgment.'" *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).

that is so cursory as to amount to no treatment at all.  A defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference.

*Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016) (internal quotation marks omitted).  "Whether an instance of medical misdiagnosis resulted from deliberate indifference or negligence is a factual question requiring exploration by expert witnesses."  *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986).

Here, the gist of Plaintiffs' claims is that the COs "were alerted to evidence of a seizure" upon arriving at Thomas' cell, and that Defendants' method of restraint and administration of Zyprexa were therefore so grossly inappropriate as to evince deliberate indifference.  Br. of Appellant at 15-17.  Even if we accept Plaintiffs' arguments about the propriety of applying restraint and Zyprexa to someone suffering a seizure, Plaintiffs fail to provide any evidence beyond conclusory, lay speculation to support the claim that Thomas was in fact having a seizure prior to the Zyprexa injection.  The only testimony from someone qualified to render medical opinions comes from Nurse Singleton, who concluded that "[Thomas] did not suffer a seizure before the Zyprexa."  Plaintiffs failed to provide any expert witnesses to support a finding of the deliberate indifference rather than mere negligence, thus failing to meet the requirements of their claim.  *See Rogers*, 792 F.2d at 1058.

10

Without showing that Defendants were deliberately indifferent to Thomas' medical needs, Plaintiffs' claim cannot survive. *See Gonzalez v. Lee Cty. Hous. Auth.*, 161 F.3d 1290, 1294 (11th Cir. 1998) ("If the non-moving party fails to 'make a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' then the court must enter summary judgment for the moving party.") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Plaintiffs fail to provide evidence sufficient to illustrate a genuine issue of material fact regarding whether Defendants violated Thomas' constitutional rights—let alone any "clearly established" rights of the sort that might overcome Defendants' qualified-immunity defense[3]—and we must therefore grant Defendants qualified immunity as to Plaintiffs' federal claims.[4]

---

[3] Seeking to satisfy qualified immunity's clearly-established prong, Plaintiffs rely primarily on two cases: *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419 (11th Cir. 1997), and *Bozeman v. Orum*, 422 F.3d 1265 (11th Cir. 2005). But these cases involve starkly different facts from those here. In *Lancaster* there was virtually no doubt that the defendant prison guards knew that the deceased inmate was going to suffer a seizure; the inmate himself and his parents conveyed this information to the defendants repeatedly, and the defendants nevertheless ignored their warnings. 116 F.3d at 1420-23. Here, by contrast, Plaintiffs fail to show that Defendants had any warning regarding Thomas' condition prior to the Signal 17, let alone that they ignored them. And *Bozeman* is perhaps even further afield. There, "the officers knew [the inmate] was unconscious and not breathing and—for fourteen minutes—did nothing. They did not check [the inmate's] breathing or pulse; they did not administer CPR; they did not summon medical help." 422 F.3d at 1274. Here, in contrast, the record demonstrates that Defendants responded to Thomas as soon as they were aware of his condition. Accordingly, even if we were to conclude that Plaintiffs had shown a constitutional violation—we conclude that they have not—we would be constrained to hold that they have failed to show the sort of clearly established law that would suffice to defeat Defendants' qualified-immunity defense.

[4] In addition to the claims against the individual defendants just discussed, Plaintiffs also brought claims under 42 U.S.C. § 1983 against the City of Jacksonville and Sheriff Rutherford. Neither claim can succeed. "[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1)

**B**

Plaintiffs also bring a variety of state-law claims against Defendants.  These too lack merit.

First, Plaintiffs bring wrongful-death claims against the City, the Sheriff, and the individual defendants.  A plaintiff must bring a wrongful-death action within two years of the death, Fla. Stat. § 95.11(4)(d); Thomas died on July  30, 2010, and Plaintiffs filed their claims on June 21, 2013, well over two years after Thomas' death.  A claimant must present his wrongful-death claim to the Florida Department of Financial Services before bringing a claim, Fla. Stat. § 768.28(6)(a)(2), and although "[t]he statute of limitations for . . . wrongful death actions is tolled for the period of time taken by the [DFS] or the appropriate agency to deny the claim," *id.* at (6)(d), "in wrongful death actions, the failure of the Department of Financial Services or the appropriate agency to make final

---

that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).  Because Plaintiffs fail to show an underlying constitutional violation, their claims against the City fail at the first step.  But even if Plaintiffs could satisfy this threshold requirement, they could not meet the other two because while their arguments revolve around allegedly improper seizure-response policies, they failed to offer evidence showing that Thomas actually suffered a seizure prior to receiving Zyprexa. Plaintiffs' claim against Sheriff Rutherford fails for similar reasons; not only do Plaintiffs fail to establish the necessary "causal connection" between the Sheriff and Thomas' death, *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295 (11th Cir. 2006), but the "causal connection" that Plaintiffs attempt to prove (once again) relies on the unsupported premise that Thomas suffered a seizure prior to receiving Zyprexa.

disposition of a claim within 90 days after it is filed shall be deemed a final denial of the claim," *id.* Even with the 90-day tolling period, Florida's statute of limitations bars Plaintiffs' claim. Plaintiffs attempt to circumnavigate this procedural obstacle by arguing that Defendants' actions constitute an intentional tort, which "may be commenced at any time," Fla. Stat. § 95.11, but Plaintiffs failed to allege any intentional torts, and, more importantly, the record supports no such claim.

Second, Plaintiffs allege that "[t]he City of Jacksonville and [the] Sheriff are liable for negligent supervision, retention, and training of the CO Defendants." Br. of Appellant at 28. "Negligent supervision occurs when during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further actions such as investigation, discharge, or reassignment." *Dep't of Envtl. Prot. v. Hardy*, 907 So. 2d 655, 660 (Fla. Dist. Ct. App. 2005). But beyond the subjective "aware[ness] of problems with an employee," a successful negligent-supervision claim has two constitutive elements: "[N]ot only must the employer owe a duty to the plaintiff, but the breach of that duty must be the proximate cause of the plaintiff's harm." *Id.* Plaintiffs here fail to offer evidence of "harm" sufficient to survive summary judgment, and, as with their claims above, thus fail to satisfy an essential element of their claim; simply assuming that

13

Thomas was suffering a seizure when the COs first arrived and that their treatment thus harmed Thomas—and providing no expert testimony to rebut Nurse Singleton's testimony to the contrary—doesn't suffice.

Third, Plaintiffs argue that "a genuine issue of material fact exists as to whether the defendants are liable for intentional or negligent delay in summoning medical care." Br. of Appellant at 32. To support this claim, Plaintiffs assert that Defendants were likely aware of Thomas' symptoms during the evening preceding his death. The only evidence that Plaintiffs cite to support this contention, however, is testimony from Jalynne Santiago—one of the plaintiffs in this case— which relies on inadmissible hearsay. Plaintiffs rejoin that "[e]ven if, as asserted by the Defendants, the CO Defendants were not alerted about Mr. Thomas' difficulty breathing," the 40- to 45-minute delay between the Signal 17 initially sounding and the medical staff reporting Thomas' vitals "creates a genuine issue of material fact on whether the CO Defendants provided timely treatment for Mr. Thomas' difficulty breathing." Reply Br. at 29. As explained above, Plaintiffs' fallback position amounts to little more than a conclusory, foundationless allegation (and is belied by a record illustrating prompt medical attention).

Plaintiffs wisely spend little time on their final state-law claim, in which they allege that "a genuine issue of material fact exists as to whether the individual defendants are liable for assault and battery." Br. of Appellant at 35. To support

14

their claim, Plaintiffs argue that "[t]he shot of Zyprexa, and the methods of restraint used [*i.e.*, the four-point restraint], involved nonconsensual and offensive contact, which contributed to Mr. Thomas' eventual death." *Id.* But where, as here, a plaintiff sues an "officer, employee, or agent of the state or any of its subdivisions" in tort, more is required; the plaintiff must not only satisfy the tort's standard elements, but must also show that the "officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a). As with many of their other arguments, Plaintiffs point to no record evidence supporting an essential element of their allegation, and the claim therefore cannot survive.

## IV

For the foregoing reasons, we **AFFIRM**.

15