**Don WALDROP, et al., Plaintiff,**

**v.**

**David C. EVANS, et al., Defendants.**

**Civ. No. 86–203–2–MAC(DF).**

United States District Court,
M.D. Georgia,
Macon Division.

March 15, 1988.

Charles A. Gower, Columbus, Ga., for plaintiff.

Michael E. Hobbs, Asst. Atty. Gen., Atlanta, Ga., Joseph H. Chambless and Emmitt H. Griggs, Ashley Royal and Jerry A. Lumley, Macon, Ga., for defendants.

FITZPATRICK, District Judge.

Plaintiffs brought the above-referenced action under 42 U.S.C. § 1983 as the parents and guardians of their mentally-ill son, Timothy Waldrop. Plaintiffs seek to recover for the self-inflicted injuries their son suffered while confined in the State prison system. Plaintiffs allege in Count I of their Complaint that Defendants violated their son's eighth amendment right against cruel and unusual punishment by acting in a manner that was deliberately indifferent to his psychiatric needs. Plaintiffs assert two pendent state claims in Counts II and III of the Complaint. Those Defendants remaining in the case have moved for partial summary judgment on Count I claiming first, that Plaintiffs have failed to show that any Defendant was deliberately indifferent to their son's medical needs, and second, that even if Plaintiffs have made such a showing, each Defendant is insulat-

ed from suit by the doctrine of qualified immunity.[1] The court heard oral argument on Defendants' motions on January 6, 1988. The court's findings of fact and conclusions of law as to each Defendant are set forth below.[2]

## I. BACKGROUND

Timothy Waldrop, now twenty-eight years old, has been suffering from a mental illness for several years. In 1979, when Waldrop first began showing signs of this illness, his parents took him to a hospital where he was diagnosed as being manic depressive. Dr. William G. Slaughter has treated Waldrop since 1980. Although Waldrop's illness required him to be hospitalized on some occasions, generally the illness could be controlled with the proper medications.

In early March of 1984, Waldrop robbed a convenience store near his home in Whigham, Georgia. Following his arrest, Waldrop was taken to a hospital instead of to the county jail. During Waldrop's thirty day stay in the hospital, Dr. Slaughter was able to stabilize him on Haldol, Cogentin, and Lithium.[3] Upon his discharge from the hospital, Waldrop was sent to the Grady County Jail.

Waldrop was in the county jail for six months. During this time, Dr. Slaughter continued to treat Waldrop on a weekly basis. At one time during the six months, Waldrop began cutting his forearm with fingernail clippers. He was hospitalized and again diagnosed as being manic depres-

sive. Following a brief stay in the hospital, Waldrop returned to the county jail. At the time of his return, Waldrop was taking Haldol, Cogentin, Lithium, and Inderal to control his manic depression.

After spending six months in the Grady County Jail, Waldrop pleaded guilty but mentally ill to the armed robbery charge. He was sentenced to a prison term of twenty years with five years to serve. Realizing that Waldrop would be entering the State prison system, Waldrop's lawyer requested that Dr. Slaughter write a letter explaining Waldrop's illness and setting forth the medications being used to control the illness. This letter was sent to officials at the Georgia Diagnostic and Classifications Center (GDCC) in Jackson, Georgia where Waldrop was to begin serving his sentence. In addition to the letter, GDCC officials received a form stating that Waldrop had been diagnosed as manic depressive and was being treated with certain medications for his illness.

Waldrop arrived at GDCC on October 15, 1984. That same day Dr. R.T. Oliver, the physician in charge of medical services at GDCC, made a notation in Waldrop's medical file that he had seen the letter from Dr. Slaughter. Dr. Oliver recommended that Waldrop remain on his medication until seen by Dr. Frank Fodor, a consulting psychiatrist who treats prisoners at GDCC for the Georgia Department of Corrections.

On October 18, 1984 Dr. Fodor saw Waldrop for approximately thirty minutes. Dr. Fodor read Dr. Slaughter's letter which was in Waldrop's medical file and conduct-

---

1. Plaintiffs named fifteen Defendants in the original Complaint. Pursuant to Plaintiffs' own motion, the court dismissed three of these Defendants, Fred Steeple (chief of media relations for the Georgia Department of Corrections), Charles Burden (warden at the Augusta Correctional and Medical Institution), and John Siler (director of information services for the Georgia Department of Corrections), on September 25, 1987. On November 30, 1987, pursuant to Plaintiffs' motion, the court dismissed Dr. R.G. Feaster from the suit. On February 13, 1988 Defendant Henry Robinson died and Dr. Robinson's counsel filed a suggestion of death with the court.

2. Plaintiffs' counsel submitted for consideration in this case, a brief from another case which is

pending at this time in the Northern District of Georgia and which involves some of the same defendants and similar questions of law. The court agrees with Defendants' counsel that they should not be required to respond to another brief involving different facts, and the court has not considered the brief in question for the purposes of preparing this Order.

3. Haldol is a potent anti-psychotic drug. Cogentin is a drug used to counteract the dangerous side effects of Haldol. Lithium is also a drug used to control mental illness and is considered to be the drug of choice for the treatment of manic depression. See Deposition of Dr. Fodor, p. 60.

ed a mental status examination of Waldrop. After the examination, Dr. Fodor concluded that Waldrop's psychiatric illness was in good remission. Dr. Fodor then recommended that Waldrop be taken off all his medication.

Waldrop was seen by Dr. T.G. Smith, a staff physician at GDCC, on October 22, 1984. Waldrop had been complaining of nausea, nightmares, and insomnia. Dr. Smith recommended that Waldrop be seen by Dr. Fodor during Dr. Fodor's next visit to GDCC. Dr. Fodor saw Waldrop on October 27, 1984, and spent approximately ten minutes interviewing Waldrop. Dr. Fodor did not put Waldrop back on any of his medications following the October 27th meeting.

On November 1, 1984, approximately two weeks after he had been taken off his medications, Waldrop cut his forearm. Dr. Smith treated and sutured Waldrop's arm. When testifying as to why he thought Waldrop had cut his arm, Dr. Smith stated that the act was an attention-getting device. Deposition of Dr. Smith, pp. 17, 20.

Four days after he had cut his arm, Waldrop gouged his left eye out of its socket. The officers who found Waldrop in his cell brought Waldrop to Dr. Smith. Dr. Smith treated Waldrop on an emergency basis and then decided that Waldrop should be sent to the Griffin–Spalding County Hospital for further treatment. Dr. Smith testified at his deposition that like Waldrop's previous complaints, the forearm laceration was Waldrop's way of getting some attention. *Id.* at pp. 19–20.

When Waldrop returned from the emergency room in Griffin, he was placed in the infirmary and seen by Dr. R.G. Feaster, another staff physician at GDCC. Dr. Feaster placed Waldrop in restraints and began him on Haldol upon instructions from Dr. Oliver. Dr. Smith saw Waldrop the next day. Waldrop was thrashing about on his bed and was refusing to eat or take his medication. Dr. Smith consulted with Dr. Oliver, and they decided that Waldrop should be placed on a daily dosage of Haldol and Cogentin.

Dr. Fodor saw Waldrop again on November 8, 1984 during a regular visit to Jackson. Waldrop appeared cooperative, relevant, and coherent at the time, and denied any suicidal ideation. Dr. Fodor agreed with the decision of Dr. Oliver and Dr. Smith to start Waldrop back on Haldol and Cogentin. Waldrop, however, was not started back on Lithium, the drug of choice for the treatment of manic depression. Dr. Fodor saw Waldrop a week later on November 15, 1984. Waldrop appeared to be relevant, coherent, and cooperative. Waldrop showed no signs of disorganized thinking and denied having any hallucinatory experiences. Dr. Fodor concluded that the Haldol was adequately stabilizing Waldrop at that time.

Waldrop was transferred to the Augusta Correctional and Medical Institution (ACMI) on November 21, 1984 for further treatment of his left eye. Upon Waldrop's arrival in Augusta, Mitchell Sowell, ACMI's mental health team leader, assigned Waldrop to the maximum security unit 3–B. Ward 3–B has fifteen open front cells with glass windows and doors. The inmates in ward 3–B do not receive shaving razors. In the center of this unit is a control booth manned by a correctional officer who has the capability of seeing into each of the fifteen cells. Sowell had been contacted by Mike Hitchcock, a behavior specialist at GDCC, concerning Waldrop's transfer. Hitchcock had informed Sowell of Waldrop's self-mutilatory act, and this information led to Sowell's decision to assign Waldrop to ward 3–B.

Sowell saw Waldrop on November 26, 1984 and approximately every day thereafter. Waldrop also was seen on several occasions by Billy Garrison, a senior counselor at the ACMI. Garrison saw Waldrop on November 27, 1984 and again on November 29, 1984. Both times Waldrop seemed to be doing well. On December 3, 1984, however, Garrison discovered that Waldrop had failed to take his last three dosages of medication. Garrison took this medication to Sowell for a follow-up. At this time Waldrop had been reassigned to ward 2–B, which is similar to ward 3–B but less secure. Sowell made the decision to

reassign Waldrop so that he would have more time outside his cell, and so that he could be around other inmates.

Also on December 3, 1984, Waldrop was seen by Dr. Charles Meyer, a consulting psychiatrist at ACMI. Dr. Meyer concluded that Waldrop was not at that time acutely suicidal or experiencing feelings or thoughts of further self-mutilization. Dr. Meyer recommended that Waldrop continue taking Haldol and Cogentin, and further recommended that the psychiatric consultant staff at ACMI follow Waldrop closely.

Sowell visited Waldrop again on December 4, 1984. At this meeting Waldrop admitted being depressed and told Sowell that he did not feel like other people. When Sowell visited Waldrop the next day, Waldrop said he did not deserve to live because of some things he had done in the past. Sowell also noticed that Waldrop had lost weight since he had been at ACMI. On December 5, 1984 Sowell informed Dr. Henry Robinson, the medical director at ACMI, of Waldrop's weight loss. Robinson referred Waldrop to an internist who was unable to pinpoint a medical reason for Waldrop's weight loss.

At 11:30 a.m. on December 6, 1984, Garrison met with Waldrop and noted that Waldrop seemed more depressed than in previous sessions. Waldrop expressed fears of being alone and informed Garrison that he had these same fears just prior to the incident involving his left eye. Garrison consulted with Sowell following this meeting and informed Sowell that Waldrop may have some behavioral problems. Sowell then met with Waldrop and concluded that Waldrop seemed depressed, but no more so than during previous meetings.

Later in the afternoon of December 6th, Waldrop used a razor blade from a disposable razor he had received in ward 2–B to cut his scrotum. Waldrop lost both testicles as a result of this self-inflicted injury. Waldrop was taken to the Talmadge Memorial Hospital where he was treated. Upon his return to ACMI, Waldrop was placed in four-point restraints and checked every fifteen minutes. The next day Waldrop was seen by Dr. Codespoti, a psychiatrist. Dr. Codespoti noted that Waldrop was in a state of severe depression, and ordered that Waldrop be given Lithium in addition to the Haldol and Cogentin he had been taking.

Waldrop subsequently was removed from four-point restraints and placed in two-point restraints. On December 10, 1984, four days after the incident involving the razor blade, Waldrop scratched his right eye so severely that it began to bleed. Waldrop was in two-point restraints at the time he scratched his eye. Following this injury Waldrop was taken to the Talmadge Memorial Hospital for treatment. Upon Waldrop's return to ACMI, Dr. Meyer ordered that Waldrop be put in four-point restraints and be given one-on-one constant supervision.

Waldrop is totally blind and has no testicles as a result of the three self-inflicted injuries. On April 18, 1986 Waldrop was given a medical reprieve and paroled by the State. He now is living at home with his parents.

## II. DISCUSSION

The court must decide two separate issues as to each Defendant. First, whether the Defendant was deliberately indifferent to a serious medical need of Waldrop. Second, whether the Defendant is protected from suit by the doctrine of qualified immunity. When deciding the first issue, the court must consider each Defendant separately to determine whether any one Defendant was deliberately indifferent to Waldrop's serious medical needs. The second issue focuses on the protection of qualified immunity which all Defendants are claiming. The court will consider the qualified immunity issue initially, and then turn to the question of deliberate indifference and each Defendants' liability under section 1983.

### A. *Qualified Immunity*

■ Defendants claim that even if an eighth amendment violation occurred, they are shielded from liability by the doctrine of qualified immunity. Specifically, Defendants contend that because the acts

Plaintiffs complain of did not violate a right clearly established by preexisting law, they are entitled to summary judgment. For the reasons set forth below, however, the court finds against Defendants on the issue of qualified immunity.

A civil action for damages may provide the only avenue of remedy for one whose constitutional rights have been violated by a government official. *See Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). The threat of personal liability and harassing litigation, however, may unduly inhibit government officials in the discharge of their duties. *Id.* To accommodate these conflicting concerns, courts developed the doctrine of qualified immunity. Qualified immunity shields government officials performing discretionary functions from civil liability, "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* —— U.S. ——, ——, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).[4]

In *Harlow, supra,* the Supreme Court decided that courts no longer should consider the subjective component of the qualified or "good faith" immunity defense. The *Harlow* decision defined the limits of qualified immunity in objective terms and instructed courts to consider only whether the official's conduct in question violated clearly established law. As noted by the *Harlow* Court:

> Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred.... If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.

*Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738 (footnotes omitted).

Since the *Harlow* decision in 1982, the Supreme Court has clarified the objective test for qualified immunity. In *Anderson, supra,* the Supreme Court stated that under *Harlow,* the question of qualified immunity "generally turns on the 'objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time [the action] was taken." *Anderson,* —— U.S. at ——, 107 S.Ct. at 3038 (citations omitted). Justice Scalia stated in *Anderson* that the operation of the qualified immunity standard "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Id.* In fashioning a rule for district courts to follow when determining what law is "clearly established" for purposes of qualified immunity, Justice Scalia noted the following:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Id.* at 3039 (citations omitted).

Plaintiffs in the instant case complain that the psychiatric care provided to Wal-

---

4. The issue of whether these Defendants are protected by qualified immunity involves the interpretation of case law in existence at the time the alleged violations occurred, and is, therefore, a question of law to be decided by the court. The Supreme Court has noted that "[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of dis-

covery." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). The *Mitchell* Court also noted that even if a plaintiff adequately alleges that a defendant committed acts that violated clearly established law, "the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts." *Id.*

drop by Defendants was grossly inadequate. Plaintiffs claim that the acts of Defendants caused Waldrop to mutilate himself on three occasions, and therefore, violated Waldrop's eighth amendment right against cruel and unusual punishment. Defendants contend that even if the acts alleged by Plaintiffs violated Waldrop's eighth amendment rights, these acts were not proscribed by clearly established law at the time they occurred. The question of qualified immunity for these Defendants turns on whether it was clearly established in November of 1984, that providing an inmate with inadequate psychiatric care could lead to a violation of that inmate's eighth amendment rights.

The court turns first to *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In *Estelle*, which was decided eight years before the alleged violations in the instant case took place, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* at 104, 97 S.Ct. at 291 (citation omitted). The Court stated that such a deliberate indifference to the serious medical needs of a prisoner states a cause of action under 42 U.S.C. § 1983

> whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.

*Id.* at 104–05, 97 S.Ct. at 291 (footnotes omitted). Defendants assert that *Estelle* sets forth "a fairly abstract test" which does not address the provision of mental health care for prisoners, and which does not establish a constitutional duty to protect an inmate from his own tendencies to injure himself. Defendants further contend that since *Anderson v. Creighton, supra*, stands for the proposition that the "clearly established law" must be fact specific, *Estelle* cannot be read to proscribe the type of conduct complained of by Plaintiffs in the instant case.

Contrary to Defendants' assertions, this court is of the opinion that a competent physician reading *Estelle* would conclude that deliberate indifference to the mental health needs of an inmate gives rise to civil liability under section 1983. Therefore, the court concludes that the conduct alleged by Plaintiffs in the instant action was proscribed by the Supreme Court's decision in *Estelle*.

The court notes, however, that it need not rely on *Estelle* as providing the clearly established law proscribing Defendants' conduct. Several cases decided after *Estelle* and before the alleged violations in this case, established the proposition that the standard of deliberate indifference for medical needs set forth in *Estelle* is equally applicable to the constitutional adequacy of psychological or psychiatric care provided at a prison. *See, e.g., Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir.1982) (failure to provide basic psychiatric and mental health care states a claim of deliberate indifference to the serious medical needs of prisoners); *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 763 (3rd Cir.1979) (deliberate indifference standard of *Estelle* is applicable in evaluating the adequacy of psychological or psychiatric care provided at a prison); *Bowring v. Godwin*, 551 F.2d 44, 47–48 (4th Cir.1977) (for purposes of considering an eighth amendment violation under *Estelle*, there is "no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart"); *Guglielmoni v. Alexander*, 583 F.Supp. 821, 826 (D.Conn. 1984) ("[t]reatment of mental disorders of mentally disturbed inmates is thus a 'serious medical need' under *Estelle* ").

Plaintiffs allege that Defendants were deliberately indifferent to the mental health needs of Waldrop during the period of time he was confined in the State prison system. The cases cited above, which were clearly established law at the time the alleged deprivation of rights occurred in the instant case, hold that a deliberate indifference to the psychiatric needs of an inmate violates that inmate's right against cruel and unusual punishment. Because the clearly established law proscribed the con-

duct complained of by Plaintiffs in this case at the time Waldrop was in the State prison system, the court finds that Defendants are not protected by the doctrine of qualified immunity.[5]

## B. *Section 1983 Claims*

As noted above, this court finds that deliberate indifference to the serious psychological or psychiatric needs of an inmate results in the infliction of pain proscribed by the eighth amendment, and therefore, states a cause of action under 42 U.S.C. § 1983.[6] *See Estelle,* 429 U.S. at 104, 97 S.Ct. at 291; *Hoptowit,* 682 F.2d at 1253; *Inmates of Allegheny County Jail,* 612 F.2d at 763; *Bowring,* 551 F.2d at 47–48; *Guglielmoni,* 583 F.Supp. at 826. Mere negligence or malpractice, however, does not violate the eighth amendment. *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292; *Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir.1986).

The Eleventh Circuit stated in *Rogers* that deliberate indifference can be shown by demonstrating either that the medical treatment was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness," *Rogers,* 792 F.2d at 1058, or by demonstrating that the medical care was "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Id.* Therefore, an essential element of Plaintiffs' claim is a showing that Defendants acted in a manner that was deliberately indifferent to the psychiatric needs of Waldrop by demonstrating either that the medical care or treatment was grossly incompetent, grossly inadequate, or grossly excessive, or by showing that the treatment was so inappropriate that it evidenced a failure to provide essential care. If Plaintiffs fail to make a showing that any Defendant was deliberately indifferent to Waldrop's mental health needs, summary judgment would be proper as to that Defendant.[7]

### *Supervisory Personnel*

■ Plaintiffs have sued David C. Evans, Commissioner of the Georgia Department of Corrections, Ralph Kemp, warden at GDCC, and L.D. Evans, deputy warden in charge of care and treatment at ACMI. Plaintiffs' main assertion against these Defendants is that their failure to properly carry out their supervisory responsibilities constituted a deliberate indifference to the serious psychiatric needs of Waldrop.

Supervising officials cannot be held liable under section 1983 on the basis of respondeat superior or vicarious liability. *See Monell v. Dep't of Social Services of City of New York,* 436 U.S. 658, 98 S.Ct. 2018,

---

5. In *Mitchell,* 472 U.S. at 530, 105 S.Ct. at 2817, the Supreme Court held that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." The court's denial of Defendants' qualified immunity defense in the case *sub judice* turns on a question of law, i.e., whether deliberate indifference to the psychiatric needs of an inmate was proscribed by clearly established law in 1984. Therefore, under *Mitchell,* Defendants have a right to an immediate appeal on the qualified immunity issue.

6. In *Estelle* the Supreme Court relied on its holding in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) in concluding that deliberate indifference to the serious medical needs of a prisoner constituted a violation of that prisoner's right to be free from cruel and unusual punishment. In *Gregg* the Court held that the "unnecessary and wanton infliction of pain" was proscribed by the eighth amendment. *Id.* at 182–83, 96 S.Ct. at 2925 (joint opinion).

7. Rule 56 of the Federal Rules of Civil Procedure allows a district court to grant summary judgment on a claim if there "is no genuine issue as to any material fact" of that claim. Fed.R.Civ.P. 56(c). For purposes of summary judgment, the non-movant's version of the facts must be accepted, and all disputed matters must be resolved in favor of the non-movant. *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). The Supreme Court has held recently, however, that summary judgment is appropriate "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof of trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Extensive discovery has been filed in this case, including the depositions of the parties which the court has considered in detail. Therefore, the court may properly rule at this time on the issue of whether Defendants were deliberately indifferent to the serious medical needs of Waldrop.

56 L.Ed.2d 611 (1978); *Rogers,* 792 F.2d at 1058; *Gilmere v. City of Atlanta,* 774 F.2d 1495 (11th Cir.1985) (en banc), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986). As stated by the Eleventh Circuit in *Gilmere,* supervisors "[can]not be held liable under section 1983 for having 'the mere right to control without any control or direction having been exercised.'" *Gilmere,* 774 F.2d at 1504, *quoting Monell,* 436 U.S. at 694 n. 58, 98 S.Ct. at 2037 n. 58. The Eleventh Circuit has held, however, that a supervisor can be liable under section 1983 if he directly participates in acts which constitute a constitutional violation, or if his actions can be causally connected to a constitutional violation. *H.C. by Hewett v. Jarrard,* 786 F.2d 1080, 1086–87 (11th Cir.1986), citing *Barksdale v. King,* 699 F.2d 744 (5th Cir.1983); *see also Taylor v. Ledbetter,* 818 F.2d 791 (11th Cir.1987). The *Hewett* Court further noted that a "violation of a duty imposed by state law resulting in constitutional injury will establish a causal connection sufficient to trigger supervisory liability." *Hewett,* 786 F.2d at 1087, citing *Barksdale,* 699 F.2d at 746.

Plaintiffs complain that Commissioner Evans failed to obtain the mental health records of mentally ill inmates coming into the State prison system and allowed a policy to be maintained whereby mentally ill inmates were taken off their medication upon entering the state prison system. Plaintiffs state that for a person serving in the role of Commissioner for the Department of Corrections, "doing *nothing* under the circumstances of [Waldrop's] case" was a deliberate indifference to that inmate's serious medical needs. Plaintiffs' Brief in Opposition to David Evans' Motion for Partial Summary Judgment, pp. 11–12. As to Ralph Kemp, Plaintiffs allege that although Kemp knew that Waldrop had been on medication before he entered the State prison system, Kemp did little to insure that Waldrop would stay on this medication once he arrived at the prison in Jackson. Plaintiffs also assert that Kemp should have known of the policy to take incoming mentally ill inmates off their medication, and he should have made certain that in-

coming mentally ill inmates were receiving proper mental health care. Plaintiffs' main allegation as to L.D. Evans is that Evans allowed a "state of confusion to exist at A.C.M.I. over *who* reports to *whom* and *who* is responsible for doing *what* in the treatment of the mentally ill." Plaintiffs' Brief in Opposition to L.D. Evans' Motion for Partial Summary Judgment, pp. 3–4. Plaintiffs state that the unorganized and unsupervised mental health services at ACMI resulted in two of Waldrop's self-mutilatory acts.

During his deposition Commissioner Evans testified that he was unaware Waldrop was in prison at the time Waldrop injured his left eye. Deposition of Commissioner Evans, p. 4. After Waldrop's first self-mutilation, Commissioner Evans asked his subordinates to look into Waldrop's problems and to see that the proper medical treatment was being provided for Waldrop. *Id.* at pp. 7–8. Upon learning that Waldrop had cut his scrotum, Commissioner Evans again instructed the subordinate professionals to insure proper treatment was being given. *Id.* at pp. 12–13. Following the second self-mutilation, Commissioner Evans was told that proper treatment was being given and that precautions were being taken to avoid additional injury. *Id.* at pp. 15–16. Commissioner Evans requested a full report on Waldrop following the third self-mutilation. *Id.* at p. 18.

Commissioner Evans further testified that at the time Waldrop entered the State penal system, the Department of Corrections was in the process of initiating an inter-agency agreement with the Department of Human Resources whereby the latter would provide prior mental status review of inmates sentenced under Georgia's guilty but mentally ill statute. The agreement, however, had not been consummated at the time Waldrop was transferred to GDCC. *Id.* at pp. 37–39.

Commissioner Evans is neither a medical professional nor a mental health professional. He must rely on the decisions of trained professionals concerning the medication and care to be given inmates. Plaintiffs' allegations fail to show that Commis-

sioner Evans either directly participated in a constitutional deprivation of rights, or that his actions can be causally connected to such a deprivation. The evidence fails to show that Commissioner Evans was deliberately indifferent to Waldrop's psychiatric needs, and therefore, summary judgment is granted in his favor.

Superintendent Kemp has general supervisory duties at GDCC. He testified at his deposition that when he received information from Dr. Slaughter's office concerning Waldrop's mental health history, he referred that information to Dr. R.T. Oliver, the medical director at GDCC. Deposition of Superintendent Kemp, p. 7. He further testified that although he was aware that some mentally ill inmates had been taken off medication in the past, he was not in a position to overrule the decisions of those physicians treating inmates with mental health problems. *Id.*

The evidence shows that Superintendent Kemp had little to do with Waldrop beyond receiving initial information about Waldrop and passing that information along to Dr. Oliver. The Superintendent is neither a psychiatrist nor a physician. Like Commissioner Evans, Superintendent Kemp must rely on the medical decisions of the physicians at GDCC concerning the medical needs of the individual inmates. The evidence further shows that GDCC was adequately staffed with medical professionals including three staff physicians and one consulting psychiatrist. Plaintiffs' allegations fail to show that Superintendent Kemp was deliberately indifferent to Waldrop's psychiatric needs, and therefore, the court grants summary judgment in his favor.

Deputy Superintendent L.D. Evans had administrative responsibilities in the operation of various care and treatment programs at ACMI. Although he provides supervision for the mental health programs at ACMI, he is not personally involved in making decisions regarding the care and treatment of mentally ill inmates. Deputy Superintendent Evans testified at his deposition that he saw Waldrop three times before Waldrop injured his right eye. Deposition of Superintendent Evans, p. 4. Evans testified that although Waldrop was generally noncommunicative when he saw him, Waldrop "always appeared to be fairly rational," and "never appeared to be in any danger to himself." *Id.* at pp. 7–8. Moreover, Evans contacted Mitchell Sowell about Waldrop's transfer to ACMI, and they decided that Waldrop's primary reason for coming to Augusta was for the treatment of his eye. *Id.* at p. 13.

Deputy Superintendent Evans is neither a psychiatrist nor a psychologist, and he was not personally involved in the decisions relating to the specific treatment of Waldrop. Although he did attempt to counsel Waldrop, he relied on the judgment of other professionals as to what medications Waldrop should be given. The evidence fails to show that Deputy Superintendent Evans was deliberately indifferent to Waldrop's psychiatric needs, and therefore, the court grants summary judgment in his favor.

Plaintiff also asserts a theory of supervisory liability against Dr. Albert Duncan, the mental health director of the Georgia Department of Corrections, and Dr. William Hopkins, the medical director of the Georgia Department of Corrections during 1984. Plaintiffs' main allegation as to these two Defendants is that they failed to implement proper policies and procedures concerning mentally ill inmates for the Department of Corrections. Plaintiffs also allege that either one or both of these Defendants should have taken steps to end the policy of taking mentally ill inmates off their medication at the time such inmates entered the State penal system. In ruling on the summary judgment motions of Defendants Duncan and Hopkins, the court must consider the role of these Defendants in establishing the policies and procedures for the Georgia Department of Corrections in 1984, and whether such policies and procedures were adequate in addressing the psychiatric needs of mentally ill inmates.

The Second Circuit Court of Appeals has held that prison officials can be liable under section 1983 for injuries to inmates caused as a result of "haphazard and ill-

conceived procedures." *Todaro v. Ward*, 565 F.2d 48, 52 (2nd Cir.1977); *see also Newman v. State of Alabama*, 503 F.2d 1320 (5th Cir.1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975). In both *Todaro* and *Newman*, however, the evidence demonstrated numerous examples of inmates who had suffered as a result of the deficient policies and procedures. *Todaro*, 565 F.2d at 53 ("despite appellants' protestations that the findings of constitutional violations are based upon only a 'handful' of individual cases, we find it both remarkable and unsettling that the court was able to cite so many instances of delayed or denied treatment"), *Newman*, 503 F.2d at 1332 ("the record is replete with countless examples of inmates who were subjected to incalculable discomfort and pain as a result of the lack of medical care or inadequacy in the treatment administered").

More importantly, unlike the instant case, the policies and procedures complained of in the above-referenced cases did not involve the administration of medication to mentally ill inmates, a decision which should be made by a psychiatrist and not by supervisory officials. Instead, the constitutional deprivations cited in those cases involved policies and procedures that could be remedied by supervisory officials. *Todaro*, 565 F.2d at 50–52 (access to treatment and administrative and record-keeping procedures); *Newman*, 503 F.2d at 1331 (shortage of qualified personnel and ill-conceived emergency and referral procedures); *see also Jones v. Evans*, 544 F.Supp. 769, 777 (N.D.Ga.1982) (training, supervision and direction of non-medical subordinates).

Plaintiffs' main contention concerning the policies and procedures in the instant case is that "it was the *policy* of the Department of Corrections [during 1984] to take incoming mentally ill inmates off their medications to see how they would react." Plaintiffs' Statement of Facts of Case, ¶ 22. The basis for this contention is a statement in Senator Paul Trulock's deposition.[8] Senator Trulock testified that Dr. Duncan had told him that Waldrop

> was removed from his medications because that's the way they handled the inmates that came into the system ... they removed everybody from their medications to see how they would react.

Deposition of Senator Trulock, p. 37. Later in his deposition, however, Senator Trulock could not remember whether he was told that all incoming mentally ill inmates were taken off their medication or whether only some mentally ill inmates had been removed from their medication. *Id.* at p. 38.

Defendants deny that it was the policy of the Georgia Department of Corrections in 1984 to take all incoming mentally ill inmates off their medication. Defendants contend that any decision to take an inmate off his medication was made on a case-by-case basis. Defendants Duncan and Hopkins claim that they not only were unaware of a practice to take mentally ill inmates off their medication, but they also were unaware that Waldrop had been taken off his medication until after he gouged out his left eye. Affidavit of Dr. Duncan, ¶ 5; Deposition of Dr. Hopkins, p. 9.

The court notes that Plaintiffs have failed to show that any other inmate in the Georgia Department of Corrections has been injured as a result of the alleged policy of taking incoming mentally ill inmates off their medication. Thus, Plaintiffs have failed to show that this policy had established a pattern of constitutional deprivations of which Defendants Duncan and Hopkins should have been aware. Certainly no such incident had ever before been brought to the attention of either Dr.

---

**8.** At the request of Waldrop's father, State Senator Trulock had contacted Commissioner Evans' office in October of 1984 to emphasize the importance of keeping Waldrop on his medication. Senator Trulock talked to John Siler the first time he contacted the Commissioner's office on October 18, 1984. According to the testimony of Waldrop's father, Senator Trulock again called Siler on October 25, 1984 to ask if Waldrop was still receiving his medication. The following day Senator Trulock called Waldrop's father and told him that Siler had confirmed that Waldrop was on his medications. Dr. Fodor, however, had taken Waldrop off his medications on October 18, 1984.

Duncan or Dr. Hopkins. These Defendants should not be held liable under a theory of supervisory liability for a policy which they did not implement, did not give approval for, and were not even aware of.

But more importantly, the court recognizes that the alleged policy in question involved a medical decision that was properly made by the treating psychiatrist and not by supervisory officials. Dr. Duncan has a Ph.D. in counseling and is neither a physician nor a psychiatrist. Although Dr. Duncan coordinates the delivery of mental health services throughout the prison system, he made no attempt to diagnose or treat mentally ill inmates, nor was he competent to exercise control over or criticize the medical decisions made by the psychiatrists treating these inmates. Affidavit of Dr. Duncan, ¶ 4. During his deposition Dr. Duncan testified as follows:

Q: Let me ask you, are you qualified, in your opinion, to diagnose a particular mental illness?

A: No, I am not. That's not my role.

Q: Are you qualified to tell if somebody is mentally ill or not?

A: No. I am not qualified by virtue of the fact that I am not licensed to make that kind of judgment.

Deposition of Dr. Duncan, pp. 8–9. Similarly, Dr. Hopkins was not involved in the treatment of inmates in the Georgia Correctional System. Dr. Hopkins testified that he would not override the decision of a treating physician to take an inmate off his medication. In his deposition Dr. Hopkins states:

It's not my responsibility to decide what a clinician gives in medication, or removes from medication.

Deposition of Dr. Hopkins, p. 16.

The court is of the opinion that when the policy in question involves a medical decision being made by the treating physician, supervisory officials who are not in a position to override that decision should not be held liable for the adverse consequences of the decision. The main responsibility of supervisory officials such as Defendants Duncan and Hopkins is to insure that the prisons in the State correctional system are adequately staffed, and that the services provided to the inmates are sufficient to meet their medical needs. Supervisory officials must rely on their subordinate professionals to make competent medical decisions. As long as supervisory officials have no reason to believe that their subordinates are failing to carry out their duties in a competent manner, they should not be held liable for medical decisions over which they have no direct control.

Plaintiffs also complain that Defendants Duncan and Hopkins failed to have a procedure in place in 1984 whereby physicians could obtain background medical information on guilty but mentally ill inmates entering the State prison system. The court notes, however, that the evidence shows that Dr. Fodor, the psychiatrist treating Waldrop at GDCC, was fully aware of Waldrop's mental illness and the medication he was taking to control this illness. Deposition of Dr. Fodor, pp. 14–15. Dr. Fodor obtained this information from Dr. Slaughter's letter which was in Waldrop's personal file. *Id.* Dr. Slaughter stated in his deposition that his letter contained sufficient background information, and the treating psychiatrist would not have needed the past medical records of Waldrop to determine a proper course of treatment. Deposition of Dr. Slaughter, pp. 125–26. Moreover, Dr. Duncan stated in his answers to Plaintiffs' interrogatories that consulting psychiatrists within the Department of Corrections routinely evaluated mentally ill inmates to determine what medication should be given to such inmates. In Waldrop's case, he was evaluated by a psychiatrist who had information about his illness and advice from his personal psychiatrist concerning the medication he had been taking. The court finds that Waldrop's eighth amendment rights were not violated by the failure to obtain his medical records prior to the self-inflicted injuries.

Plaintiffs also complain about the inadequacy of the mental health services at GDCC and ACMI during 1984. The evidence shows that Mike Hitchcock was responsible for coordinating mental health

services at GDCC during the latter part of 1984. Deposition of Dr. Duncan, p. 61. Hitchcock stated that although he was not required to do so, he visited the prison wing where Waldrop was confined several times a week to talk to the inmates. Deposition of Michael Hitchcock, pp. 5–6. Moreover, the Department of Corrections had contracted with a psychiatrist and a psychologist to come to GDCC on a weekly basis to evaluate the status of the mentally ill inmates at Jackson. The evidence fails to show that the mental health services at GDCC were deficient during 1984.

The court further notes that although the evidence is somewhat unclear as to the structure of authority at ACMI, adequate mental health services were in existence at this Institution during 1984. Several psychiatrists and counselors were employed at the medical institution in Augusta at the time Waldrop was there. Two of these counselors, Mitchell Sowell and Billy Garrison, saw Waldrop on several occasions. Waldrop also was seen and evaluated by a staff psychiatrist, Dr. Meyer, before the second self-mutilation. The court finds that although the mental health services probably could have been better organized at GDCC and ACMI in 1984, the system in place adequately served the psychiatric needs of those mentally ill inmates confined at these two institutions. Thus, Plaintiffs have failed to establish that the polices and procedures in place in the Georgia Department of Corrections in 1984 resulted in a deliberate indifference to the psychiatric needs of mentally ill inmates.[9]

In addition to this court's finding that neither Dr. Duncan nor Dr. Hopkins can be held liable under a theory of supervisory liability for the policies and procedures in place in the Georgia Department of Corrections during 1984, the court notes that these Defendants did not act individually in a manner that was deliberately indifferent to the psychiatric needs of Waldrop. As noted above, neither Dr. Duncan nor Dr. Hopkins was aware of Waldrop's situation until after the incident involving his left eye. After Dr. Hopkins became aware of Waldrop's first mutilatory act, he inquired as to where Waldrop was being treated. Deposition of Dr. Hopkins, p. 9. Dr. Hopkins' main concern was that Waldrop be transferred to Augusta where he could receive better treatment. Dr. Hopkins was informed that Waldrop had been transferred from Jackson to Augusta following the first injury. Id. at pp. 9–10.

When Dr. Duncan learned of the incident involving Waldrop's left eye, he stated that he contacted Mitchell Sowell regarding Waldrop's anticipated arrival at ACMI. Answer of Dr. Duncan to Plaintiffs' Interrogatory 1. Dr. Duncan provided Sowell with information about Waldrop that Dr. Duncan had received from Waldrop's parents. Affidavit of Dr. Duncan, ¶ 6. The evidence shows that upon learning of Waldrop's plight, Defendants Duncan and Hopkins acted in a manner consistent with their supervisory position in attempting to insure that proper treatment would be provided for Waldrop in the future. The evidence fails to show that either Dr. Hopkins or Dr. Duncan acted in a manner that demonstrated deliberate indifference to the medical needs of Waldrop.

---

**9.** This court's finding that Defendants David Evans, Kemp, L.D. Evans, Duncan, and Hopkins should not be held liable under a theory of supervisory liability is supported by the Supreme Court's language in a very recent decision, *City of St. Louis v. Praprotnik,* —— U.S. ——, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). In considering a policymaking official's liability under section 1983 for the decisions of his subordinates, the Court stated, "[s]imply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy." *Id.* at ——, 108 S.Ct. at 927. The Court went on to note that a supervisor may be subject to liability if the subordinate's decision "was cast in the form of a policy statement and expressly approved by the policymaker," or "if a series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware." *Id.* In the instant case, Dr. Fodor's alleged policy of taking incoming inmates off their medication was not expressly approved by any of these supervisory Defendants, nor were these Defendants aware of Dr. Fodor's practice. Therefore, Dr. Fodor's actions did not rise to the level of a system-wide policy for which these supervisory Defendants could be held liable under section 1983.

*Medical Personnel*

Plaintiffs name six physicians as Defendants in their Complaint. The court now will consider each of these physicians separately in determining whether any one or more of them demonstrated a deliberate indifference to the serious psychiatric needs of Waldrop.

*Dr. Frank Fodor*

■ Dr. Fodor was a consulting psychiatrist to the Georgia Department of Corrections in 1984. He visited GDCC every seven to ten days. Dr. Fodor saw Waldrop on four occasions while he was confined at GDCC, two times before and two times after he gouged out his left eye.

Dr. Fodor's first visit with Waldrop was on October 18, 1984, three days after Waldrop arrived at Jackson. Dr. Fodor read Dr. Slaughter's letter, which was in Waldrop's file, and realized that Waldrop had been taking powerful antipsychotic medication for several months. Deposition of Dr. Fodor, pp. 49–50. At this initial meeting, Dr. Fodor conducted a thirty to thirty-five minute interview with Waldrop. *Id.* at p. 8. Following this interview Dr. Fodor concluded that Waldrop was a coherent, logically thinking individual, who showed no signs of delusions, hallucinations, thought disorder, depression, or mania. *Id.* at p. 10. Although Dr. Fodor recognized that Waldrop had been suffering from a mental illness in the past, he felt that this illness was in good remission. *Id.* at p. 13. Upon making this conclusion, Dr. Fodor took Waldrop off all his medication. *Id.* at p. 16.

Dr. Fodor admitted at his deposition that one explanation for Waldrop's failure to exhibit any signs of mental illness on October 18th could have been that Waldrop's medication was effectively controlling his behavior. *Id.* at p. 151. He also testified, however, that he sees no causal connection between the discontinuance of Waldrop's medication and his subsequent acts of self-mutilation. *Id.* at pp. 16–19. The court notes that the evidence shows that once Dr. Slaughter began Waldrop on the proper dosages of medication while Waldrop was at the Grady County Jail, Waldrop committed no acts of self-mutilation for several months. His first self-mutilation occurred approximately two and a half weeks after the medication was discontinued by Dr. Fodor.

Four days after Dr. Fodor took Waldrop off the medication, Waldrop began complaining of nausea, nightmares, insomnia, and severe depression. Dr. Smith saw Waldrop, noted Waldrop's complaints in his file, and referred him back to Dr. Fodor. When Dr. Fodor saw Waldrop five days later, on October 27, 1984, he talked to Waldrop for approximately ten minutes. *Id.* at 25. He saw no reason to put Waldrop back on any of his medication following the October 27th visit. Affidavit of Dr. Fodor, ¶ 4.

Dr. Fodor did not see Waldrop again until November 8, 1984, three days after Waldrop had gouged out his left eye. Dr. Fodor noted at this meeting that Waldrop denied any suicidal ideation, and that his responses were appropriate. *Id.* at ¶ 5. Dr. Oliver had administered Haldol and Cogentin to Waldrop following the first self-mutilation. When Dr. Fodor visited GDCC on November 8th, he concluded that the medication Waldrop was on at that time was adequate to control Waldrop's behavior. *Id.* Dr. Fodor saw Waldrop a week later on November 15th. He again concluded that the medication Waldrop was on "appeared sufficient to keep him stabilized." *Id.* at ¶ 7.

The evidence shows Dr. Fodor had read Dr. Slaughter's letter at the time he began treating Waldrop and was aware that Waldrop had been diagnosed as manic depressive. Deposition of Dr. Fodor, pp. 49–50. Dr. Fodor knew that before Waldrop arrived at GDCC, he had been taking Lithium in addition to Haldol and Cogentin to control his mental illness. Dr. Fodor admitted at his deposition that Lithium is the drug of choice for treating a manic depressive illness. Dr. Fodor also stated that patients with such an illness should use Lithium indefinitely to control the illness. *Id.* at pp. 60–62. Notwithstanding these facts, Dr. Fodor decided to take Waldrop off all his medication on October 18, 1984. He re-

fused to put Waldrop back on any medication on October 27th even though he knew Waldrop had been complaining of certain physical problems and severe depression. Moreover, even after Waldrop gouged out his left eye, Dr. Fodor did not recommend that Waldrop be put back on Lithium.

Plaintiffs' expert testified at his deposition that taking Waldrop abruptly off his medication demonstrated a deliberate indifference to Waldrop's medical needs. Deposition of Dr. Slaughter, pp. 126–32. The court finds that the evidence along with Dr. Slaughter's deposition and affidavit raise a factual question as to whether Dr. Fodor's treatment was either a matter of gross incompetence or demonstrated a refusal to provide essential care. The record contains factual disputes and differing inferences concerning the extent of Dr. Fodor's departure from the professional standard, and the court finds that reasonable minds could differ as to whether Dr. Fodor's conduct constituted proper treatment, negligence, or deliberate indifference. Because a jury could find that Dr. Fodor was deliberately indifferent to Waldrop's psychiatric needs, the court denies summary judgment in favor of Dr. Fodor.

### Dr. T.G. Smith

■ Dr. Smith was a staff physician at GDCC during 1984. He saw Waldrop on two occasions between the time Dr. Fodor took Waldrop off his medication and the time Waldrop gouged out his left eye. The first of these occasions was on October 22, 1984, four days after Waldrop's medication had been discontinued. Waldrop complained to Dr. Smith of nausea, nightmares, and insomnia, and told Dr. Smith that he was severely depressed. Deposition of Dr. Smith, pp. 12–14. Dr. Smith did not give Waldrop any medication at this time. He did, however, make a notation in Waldrop's file that Waldrop should be seen by Dr. Fodor during Dr. Fodor's next visit to GDCC. *Id.*

Dr. Smith saw Waldrop a second time on November 1, 1984. Waldrop had self-inflicted lacerations on his forearm, which Dr. Smith sutured and treated. Although Dr. Smith noted this incident in Waldrop's file, he did not contact Dr. Fodor about the attempted suicide. Dr. Smith stated at his deposition that self-inflicted lacerations are common among inmates at the GDCC. *Id.* at p. 17.

Plaintiffs' expert testified at his deposition that in light of the reality that Waldrop had been removed abruptly from his medication, the fact that he lacerated his forearm should have been a "storm warning" to Dr. Smith and Dr. Fodor. Deposition of Dr. Slaughter, p. 166. Dr. Slaughter also stated that the failure to put Waldrop back on his medication following this "storm warning" demonstrated a deliberate indifference to Waldrop's medical needs. *Id.* at pp. 198–203.

The evidence is somewhat unclear as to whether Dr. Smith had read Dr. Slaughter's letter or whether he knew Dr. Fodor had removed Waldrop from his medication. The court notes, however, that this information was in Waldrop's file when Dr. Smith saw Waldrop on October 22nd, and viewing the facts in a light most favorable to Plaintiffs, the court finds that Dr. Smith must be charged with the knowledge of Dr. Slaughter's letter and Dr. Fodor's decision. The court further notes that Dr. Smith saw Waldrop twice after Dr. Fodor took him off his medication, and both times Waldrop showed signs of reacting adversely to the discontinuance of the medication. The second time Dr. Smith failed to contact Dr. Fodor about the injury, and before Dr. Fodor could see Waldrop following the forearm lacerations, Waldrop gouged out his left eye. When testifying as to why he thought Waldrop had injured his eye, Dr. Smith stated:

It was just one of those attention-getting device sort of things. It was just a little bit more than a self-inflicted laceration.

Deposition of Dr. Smith, pp. 19–20.

The court recognizes that Dr. Smith may not have been in a position to prescribe the type of medication that would control Waldrop's mental illness. The court finds, however, that recognizing Dr. Smith knew of Waldrop's illness, the failure to contact Dr. Fodor following the self-inflicted fore-

arm laceration raises a factual question as to whether Dr. Smith was deliberately indifferent to Waldrop's medical needs. Dr. Smith was the last physician to see Waldrop before he gouged out his left eye. Dr. Smith's attitude toward Waldrop was that he had complained of nausea and depression, and cut his arm, simply to get some attention. A jury could find that Dr. Smith's failure to contact Waldrop's psychiatrist following the "storm warning" demonstrated either grossly inadequate medical treatment or a refusal to provide essential care.

The court finds that the evidence places in issue whether Dr. Smith's failure to contact Dr. Fodor was gross incompetence. As noted in *Rogers*, "*Gamble* does not necessarily excuse one episode of gross misconduct merely because the overall pattern reflects general attentiveness." *Rogers*, 792 F.2d at 1062, *quoting Murrell v. Bennett*, 615 F.2d 306, 310 n. 4 (5th Cir.1980). The factual issue of Dr. Smith's deliberate indifference must be decided by a jury, and therefore, the court denies summary judgment in favor of Dr. Smith.

*Dr. R.T. Oliver*

■ Dr. Oliver was the physician in charge of medical services at GDCC during 1984 and was responsible for overseeing all aspects of medical care and treatment at the Center. As part of his administrative responsibility, Dr. Oliver reviewed Waldrop's records and Dr. Slaughter's letter at the time Waldrop arrived in Jackson. Deposition of Dr. Oliver, pp. 36–37. After reviewing Waldrop's records, Dr. Oliver noted in Waldrop's file the medications Waldrop was taking, and instructed that Waldrop be continued on these medications until he could be seen by Dr. Fodor. *Id.* Dr. Oliver did not see Waldrop or administer any direct care at the time he reviewed Waldrop's file. *Id.*

As an administrative matter, Dr. Oliver reviewed the medical evaluations of the psychiatrists treating inmates at GDCC. In line with this policy, Dr. Oliver reviewed Dr. Fodor's medical report of October 18, 1984, in which Dr. Fodor noted that he had discontinued Waldrop's medication. *Id.* at p. 50. The record does not show any further involvement of Dr. Oliver with Waldrop until after Waldrop injured his left eye. *Id.* at pp. 24–25.

After Waldrop injured his eye on November 5, 1984, he was sent to a hospital in Griffin, Georgia for emergency treatment. Waldrop returned to Jackson the same day, and Dr. Oliver ordered that Haldol be administered to Waldrop to keep him from further harming himself. *Id.* at p. 25. Dr. Fodor was not at GDCC at the time Waldrop injured his left eye and did not participate in the decision to place Waldrop on Haldol.

The next day Dr. Smith visited Waldrop and discovered that Waldrop was thrashing about on his bed and refusing to eat or take his medication. Deposition of Dr. Smith, p. 21. Dr. Smith consulted with Dr. Oliver, and they decided to increase the dosage of Haldol and administer Cogentin. *Id.* at pp. 21–22. Dr. Oliver visited Waldrop after the medication had been administered and found him sedated, but lucid. Waldrop denied hallucinations or delusions and expressed no suicidal ideation. He did state, however, that he wanted to go to the Central State Hospital because he did not like the GDCC. *Id.* at p. 26; Medical Record, 54. When Dr. Fodor returned to the GDCC on November 8th, he concurred in Dr. Oliver's decision to place Waldrop on Haldol and Cogentin. Dr. Oliver saw Waldrop again on November 9th and found him lucid, oriented, and quiet. Medical Record, 30, 58. Following this visit, Dr. Oliver decreased the dosage of Haldol.

Plaintiffs claim that Dr. Oliver demonstrated a deliberate indifference to Waldrop's medical needs in both his direct contact with Waldrop and in his capacity as a supervisory official. Plaintiffs argue that Dr. Oliver demonstrated deliberate indifference in allowing Dr. Fodor to remove Waldrop from his medication. The evidence is less than clear as to how often incoming mentally ill inmates were removed from their medication. Dr. Oliver testified at his deposition, however, that inmates were rarely taken off medication that was being administered to control mental illness.

Deposition of Dr. Oliver, pp. 49–50. Plaintiffs argue that if this was rarely done, Dr. Oliver should have been greatly concerned upon learning that Dr. Fodor had removed Waldrop from his medication, especially since Dr. Oliver was aware of Dr. Slaughter's letter.

Plaintiffs submit the deposition and affidavit of Dr. Slaughter in support of their position that Dr. Oliver was deliberately indifferent to Waldrop's medical needs. Dr. Slaughter testified in his deposition that Dr. Oliver must have known that taking Waldrop off his medication was a gross error in medical judgment, and one which Dr. Oliver should have corrected. Deposition of Dr. Slaughter, pp. 204–06. Dr. Slaughter also stated that Dr. Oliver should have obtained a second expert opinion about Dr. Fodor's decision to remove Waldrop from his medication. *Id.* at 207.

The court finds, however, that the evidence fails to support a conclusion that Dr. Oliver's actions in either an individual or supervisory capacity were deliberately indifferent to Waldrop's psychiatric needs. The court is of the opinion that because Dr. Oliver is not a practicing psychiatrist, he must depend on the decisions of the treating psychiatrists concerning the medications to be given inmates. As stated in *Monell, supra,* the mere right of a supervisory official to control a decision does not necessarily give rise to liability under section 1983 without any control or direction having been exercised by the official. *Monell,* 436 U.S. at 694 n. 58, 98 S.Ct. at 2037 n. 58.

The critical distinction between Dr. Oliver and Dr. Smith is that Dr. Smith had direct contact with Waldrop on at least two occasions between the time Dr. Fodor removed Waldrop from his medication and the time Waldrop gouged out his left eye. Dr. Smith was fully aware of the "storm warnings," i.e., Waldrop's complaints of insomnia, nausea, nightmares and severe depression, as well as his unsuccessful suicide attempt, whereas Dr. Oliver was not aware of these actions until after Waldrop injured his eye.

Dr. Oliver's actions were consistent with his administrative role. He kept Waldrop on his medications until Waldrop was seen by the treating psychiatrist. Once Dr. Fodor made the decision to remove Waldrop from his medication, Dr. Oliver reviewed the decision in his administrative capacity. Dr. Oliver did not have the type of direct contact with Waldrop that could have alerted him to the fact that Waldrop needed to be placed back on his medication prior to the first self-mutilation. Once Waldrop injured his eye, Dr. Oliver made an emergency decision to administer medication to Waldrop. Dr. Oliver then visited Waldrop on at least two occasions to make sure the medication was effectively controlling Waldrop.

Although Dr. Oliver's judgment not to overrule Dr. Fodor's decision may give rise to a claim of negligence or malpractice, Dr. Oliver's actions do not demonstrate a deliberate indifference to the psychiatric needs of Waldrop. Dr. Oliver's conduct was neither grossly incompetent or inadequate, nor did his actions demonstrate intentional maltreatment. Because negligence and malpractice do not rise to the level of a constitutional deprivation, *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292, the court grants summary judgment in favor of Dr. Oliver.

### *Dr. Henry Robinson* [10]

■ Dr. Robinson was the medical director of ACMI during 1984. Dr. Robin-

---

**10.** As noted in footnote 1, *supra,* Dr. Robinson died on February 13, 1988. On February 17, 1988 Dr. Robinson's counsel filed a suggestion of death with the court. Under Rule 25(a) of the Federal Rules of Civil Procedure, if the claim is not extinguished by the death of the party, any of the remaining parties may file a motion for substitution of a proper party with the court. Fed.R.Civ.P. 25(a)(1). If the motion for substitution is not made within 90 days of the filing of the suggestion of death, the action can be dismissed as to the deceased party. Although no motion for substitution has yet been filed, the court notes that this Order will be issued several weeks before the time runs for the filing of such a motion. Because it finds in favor of Dr. Robinson on the merits of the section 1983 claim, the court has decided as a matter of judicial economy to include Dr. Robinson in this Order.

The parties have not briefed the issue of whether the section 1983 claim against Dr. Rob-

son, however, had no direct involvement in either the medical or psychiatric care provided to Waldrop at the Institution. According to Dr. Robinson's Affidavit, he was not present at ACMI on December 6, 1984, the day Waldrop cut his scrotum, nor was he present when Waldrop was returned to the Institution, admitted as a patient to the medical unit, placed in restraints, and put under suicide watch. Affidavit of Dr. Robinson, ¶ 10. Plaintiff's main complaint against Dr. Robinson is that his failure to treat Waldrop, along with the disorganized supervision of those who were treating Waldrop, demonstrated a deliberate indifference on his part to Waldrop's psychiatric needs.

The dispute arising as to Dr. Robinson concerns the scope of his authority at ACMI. Dr. Robinson states that he had no direct involvement in work performed by members of the Department of Corrections Mental Health/Mental Retardation (MH/MR) team or in work performed by psychiatric consultants at ACMI. *Id.* at ¶ 5. He also states that he had no supervisory control over the work performed by the MH/MR team or the consulting psychiatrists. *Id.* at ¶ 4. The warden at the Augusta Institution testified at his deposition, however, that all health care providers at ACMI report clinically to the medical director, Dr. Robinson. Deposition of Dr. Burden, pp. 15–16. Dr. Meyer, a consulting psychiatrist at ACMI, also testified that Dr. Robinson would have the ultimate responsibility for the medical decisions made by the consulting psychiatrists. Deposition of Dr. Meyer, pp. 86–87.

Viewed in a light most favorable to Plaintiffs, the facts show that Dr. Robinson had some supervisory authority over the decisions made by the consulting psychiatrists at ACMI. Recognizing this fact, Plaintiffs point to a recommendation that was prepared by a psychiatric consultant the day after Waldrop cut his scrotum. In that report, the psychiatrist stated that Waldrop should be "accompanied at all times." Medical Record, 76. Plaintiffs argue that had these instructions been carried out by Dr. Robinson, Waldrop might not have injured his right eye three days later. The undisputed evidence shows, however, that Dr. Robinson was not at ACMI when this report was issued, and he did not learn the results of the report until after Waldrop had injured his right eye. Affidavit of Dr. Robinson, ¶ 8.

Plaintiff also complains that Dr. Robinson was indifferent to Waldrop's medical needs in that he did nothing after Garrison noted in an interview with Waldrop on December 6, 1984, that Waldrop was feeling the same way he had before he gouged out his left eye. Once again, Dr. Robinson's testimony is that he left ACMI on the afternoon of December 6th and was not aware of Garrison's findings. *Id.* at ¶ 10.

Dr. Robinson testified that although he was the medical director at ACMI, he was not involved directly in the treatment of mental illness. Deposition of Dr. Robinson, p. 20. Dr. Robinson relied on the medical decisions of the consulting psychiatrists in treating mentally-ill inmates. He also relied on the MH/MR team and support staff to follow through on the recommendations of the psychiatrists. Dr. Duncan's testimony supports this conclusion.

Q: Would you agree that Timmy Waldrop's care insofar as mental health is concerned was your responsibility?

A: No.

Q: Whose was it?

A: The treating physicians and ancillary personnel who were involved in the day-to-day treatment and management of his case.

Deposition of Dr. Duncan, pp. 26–27.

Although the testimony is conflicting as to the authority structure at ACMI, the

inson is extinguished by his death, and the fact that the court issues its ruling as to Dr. Robinson today does not imply that the court finds that such a claim would survive Dr. Robinson's death. The court notes, however, that the end result would be the same as to the Plaintiffs' eighth amendment claim against Dr. Robinson. If the parties' research and briefing demonstrat-

ed that such a claim does not survive the death of a party, the court would dismiss the claim against Dr. Robinson. Even if the relevant authority held that such a claim does survive the death of a party, the court would grant summary judgment as to Dr. Robinson based on the merits of the claim.

policies and procedures in place during 1984 fail to demonstrate that those ACMI officials in control of the medical care of the inmates displayed a deliberate indifference to the physical or mental needs of these inmates. Consulting psychiatrists and psychologists were on hand to perform evaluations of mentally ill inmates on a weekly basis. Moreover, the MH/MR team and support staff visited the inmates on a daily basis. ACMI also had security wards where inmates could be monitored regularly. Such procedures, staffing, and facilities fail to demonstrate that the officials at ACMI were grossly incompetent in meeting the needs of the inmates at ACMI.

Waldrop was being treated and seen by a psychiatrist and at least two counselors at ACMI. Although Dr. Robinson may have had ultimate authority over those treating Waldrop, his failure to overrule the treatment decisions of the responsible personnel did not demonstrate a refusal to provide essential care to Waldrop. Moreover, recognizing that Dr. Robinson was absent during much of the time period in question, the court finds that the evidence fails to show that Dr. Robinson was grossly incompetent in performing his duties. Because Plaintiffs have failed to demonstrate a deliberate indifference on the part of Dr. Robinson, the court grants summary judgment in his favor.

### Dr. Charles Meyer

■ Dr. Meyer worked as a consulting psychiatrist at ACMI during 1984. Dr. Meyer's first involvement with Waldrop occurred on December 3, 1984, after Waldrop's first incident of self-mutilation and before the other two incidents. Affidavit of Dr. Meyer, ¶ 3. On December 3rd Dr. Meyer examined Waldrop for approximately an hour and a half. Dr. Meyer's examination occurred almost a full month after the incident involving Waldrop's left eye and three weeks after Waldrop had been released from restraints. Following this examination Dr. Meyer concluded that the Haldol and Cogentin Waldrop was taking were adequately controlling Waldrop's mental illness. Id. at ¶ 6. He recommended that Waldrop continue on these medications. Id. Dr. Meyer specifically noted that Waldrop was not suicidal or having thoughts of self-mutilation at the time of this examination. Id. Dr. Meyer also recommended that the staff at ACMI trained to deal with mentally ill inmates maintain frequent contact with the patient. Id. Dr. Meyer saw Waldrop again on December 10, 1984 after Waldrop had scratched his right eye. At that point Dr. Meyer ordered that Waldrop be put in four-point restraints and be given constant one-on-one supervision. Id. at ¶ 7.

Plaintiff's expert, Dr. Slaughter, stated in his Affidavit that Dr. Meyer's failure to put Waldrop back on Lithium after the December 3rd examination "was nothing but a demonstration of recklessness and deliberate indifference to [Waldrop's] serious medical needs." Affidavit of Dr. Slaughter concerning Dr. Meyer, ¶ 10. The court, however, disagrees with Dr. Slaughter's legal conclusion which is not supported by the facts in evidence in this case. Dr. Meyer made a medical decision to keep Waldrop on the medication that had been stabilizing him for almost a month. Waldrop showed no signs at the December 3rd examination that these drugs were not adequately controlling his illness. Viewed in the most favorable light, Dr. Slaughter's allegations describe only negligence, not a deliberate indifference to Waldrop's psychiatric needs. As stated in *Estelle*, however, mere negligence or malpractice does not violate the eighth amendment. *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292. The court finds that Dr. Meyer's conduct was not grossly incompetent or inadequate, nor did his conduct evidence a refusal to provide essential care. Thus, Plaintiffs have failed to demonstrate a deliberate indifference on the part of Dr. Meyer, and the court grants summary judgment in his favor.

### Non–Supervisory, Non–Medical Personnel

### Mitchell Sowell

■ Sowell was the mental health, mental retardation team leader at ACMI during 1984. Sowell is neither a physician nor a psychiatrist, and he does not make medical decisions concerning the treatment of men-

tally-ill inmates. Sowell's position required him to be administratively responsible for the consulting psychiatric and psychological services provided to the inmates in his department at ACMI. Affidavit of Mitchell Sowell, ¶ 9.

Sowell first learned of Waldrop when Mike Hitchcock called to inform Sowell that Waldrop was being transferred from Jackson to the medical institution in Augusta. *Id.* at ¶ 10. Hitchcock told Sowell that Waldrop had injured his left eye while off his medication. Hitchcock also informed Sowell that Waldrop was psychologically tested after his first self-mutilation, he was receiving anti-psychotic medication, and he seemed to be stabilizing. *Id.* Sowell saw Waldrop on November 21, 1984, the day he arrived at ACMI. Upon Waldrop's arrival, and based on the information he had received from Hitchcock, Sowell decided to place Waldrop in the maximum security unit 3B. *Id.* at ¶¶ 12–13. Ward 3B was the safest, securest, and most protected environment at ACMI. *Id.* at ¶ 13.

Sowell visited Waldrop again on November 26, 1984, Sowell's first day back to work following the holiday weekend. Sowell found no evidence of suicidal thoughts or self-mutilation during this visit. *Id.* at ¶ 14. Billy Garrison, senior counselor at ACMI, visited Waldrop on November 27th and 29th and found him to be doing well. On the 29th Sowell decided to move Waldrop from unit 3B to unit 2B. Although unit 2B is a security unit, unlike ward 3B, inmates are issued disposable razors in unit 2B. In many other respects unit 2B is very similar to unit 3B. Sowell decided to move Waldrop based on Waldrop's "improved condition, his successful adaption to his new environment, and ... [Sowell's] professional judgment that Waldrop needed more freedom of movement and contact with other inmates and staff for therapeutic reasons." *Id.* at ¶ 15.

Sowell scheduled a psychiatric appointment for Waldrop on December 3, 1984. The psychiatrist met with Waldrop for over an hour with Sowell present. *Id.* at ¶ 18. When asked at his deposition why he waited almost two weeks to schedule the appointment, Sowell stated:

A: [Waldrop] came to ACMI as a medical transient. He was brought by ... the medical section for a clinic appointment and could have returned at any time to Jackson, depending on when the medical section felt that he should return. There was no indication at that time that he was going to be at ACMI on a long-term basis. In addition, he had just seen a psychiatrist before he came to ACMI, so there was no indication that he needed to see a psychiatrist any sooner.

Deposition of Mitchell Sowell, pp. 8–10.

The evidence is in dispute as to who actually ordered the psychiatric evaluation, Dr. Duncan or Sowell. Regardless of who ordered the evaluation, the fact that Waldrop was seen by psychiatrists twice within two weeks, and by at least two counselors during that same two-week period, demonstrates that the personnel involved with Waldrop's treatment were not deliberately indifferent to his needs before he committed the second self-mutilation.

Sowell met with Waldrop again on December 4, 1984. Sowell stated that although Waldrop seemed depressed on the 4th, he denied any desire to harm himself. Affidavit of Mitchell Sowell, ¶ 19. Sowell also stated that Waldrop responded positively to the counselling he provided. Sowell informed Dr. Robinson of Waldrop's weight loss on December 5th. Dr. Robinson stated that he would get a doctor to evaluate Waldrop. *Id.* at ¶ 20. Sowell visited Waldrop again that same day and provided supportive counselling.

On December 6, 1984 Garrison informed Sowell that Waldrop had skipped three dosages of medication. Sowell met with Waldrop on the 6th and concluded that although Waldrop was down, he was coping and stable. *Id.* at ¶¶ 22–23. Later that day Waldrop cut his scrotum. Sowell's next visit with Waldrop was on December 10, 1984. Waldrop was asleep and Sowell did not talk to him. *Id.* at ¶ 27.

The evidence shows that Sowell is not competent to make psychiatric judgments or contradict psychiatric judgments made by a licensed psychiatrist. Sowell counseled Waldrop on several occasions and referred Waldrop to both Dr. Meyer and Dr. Robinson at different times. Viewed in the light most favorable to Plaintiffs, the allegations against Sowell at best demonstrate only negligence. Sowell performed his duties in a competent manner and appeared to show genuine concern for Waldrop's situation. Because an allegation of mere negligence does not rise to the level of a constitutional violation, *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292, the court grants summary judgment in favor of Defendant Sowell.

## C. *Pendent State Law Claims*

■ In 1985 the Georgia legislature amended subsection (a) of O.C.G.A. § 9–2–61 to allow plaintiffs whose timely pendent state claims had been dismissed by a district court to refile those claims in a state court within six months of the dismissal. The amended version of the statute reads in pertinent part:

> When any case has been commenced in either a state or federal court within the applicable statute of limitations and the plaintiff discontinues or dismisses the same, it may be recommenced in a court of this state ... either within the original applicable period of limitations or within six months after the discontinuance or dismissal, whichever is later; provided, however, if the dismissal or discontinuance occurs after the expiration of the applicable period of limitation, this privilege of renewal shall be exercised only once.

O.C.G.A. § 9–2–61(a) (Supp.1987). This amendment effectively overruled the portion of those cases which were decided prior to the enactment of the amendment and which held that it would be an abuse of discretion for a district court to dismiss a pendent state claim which became time barred while the court had it under consideration. *See Emory v. Peeler*, 756 F.2d 1547, 1555 (11th Cir.1985) (decided on April 8, 1985, prior to the amendment's effective date of July 1, 1985); *see also Blaustein v.*

*Harrison*, 160 Ga.App. 256, 286 S.E.2d 758, 759 (1981) (holding that former section 9–2–61 did not apply when the original filing was in federal court).

The court also notes that "while on its face the statute allows refiling only where the *plaintiff* dismisses the original action, the Georgia courts have repeatedly held that the section 'applies to involuntary as well as voluntary dismissals where the merits are not adjudicated.'" *O'Neal v. Dekalb County*, 667 F.Supp. 853, 859 (N.D. Ga.1987), citing *Fowler v. Aetna Casualty & Surety Co.*, 159 Ga.App. 190, 192, 283 S.E.2d 69 (1981) (emphasis added). When a district court exercises its discretion in dismissing pendent state claims, the court does not reach the merits of those claims. *O'Neal*, 667 F.Supp. at 859. In the *O'Neal* case, Judge Hall of the Northern District of Georgia dismissed the plaintiffs' pendent state law wrongful death and medical malpractice claims after ruling that plaintiffs' section 1983 claim had failed as a matter of law. Judge Hall correctly ruled that "[f]or purposes of plaintiffs' state law claims, the merits of which this court has not adjudicated, the statute of limitations was effectively tolled on the date they filed their complaint in federal court." *Id.*

The case *sub judice* presents a similar situation to the one arising in *O'Neal*. Plaintiffs in this case filed their state law claims along with their section 1983 claims in federal court before the period of limitation had run. The statute of limitations ran during the time their case was pending in this court. The amended version of O.C. G.A. § 9–2–61, however, allows this court to dismiss the pendent state claims, without abusing its discretion, by giving Plaintiffs the opportunity to renew their state law causes of action in state court within six months of the dismissal.

The court is mindful of the Supreme Court's statement concerning pendent jurisdiction found in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966):

> Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

Accordingly, the court exercises its discretion in dismissing without prejudice the state medical malpractice claims pending against those Defendants to whom this court has granted summary judgment on the section 1983 claims. The court, however, will retain jurisdiction of the pendent state claims against Defendants Fodor and Smith, and these claims will be tried before a jury along with Plaintiffs' section 1983 claims against these Defendants.

## III. CONCLUSION

This court cannot conclude this Order without some comment on the series of events that placed Timmy Waldrop in the prison system of the State of Georgia where this tragedy began. The court further acknowledges that it is understandable that the Plaintiffs and others who knew of Timmy's emotional instability are embittered by the events of October through December, 1984 while their son was incarcerated. It is apparent that in his home town of Whigham, Georgia, Timmy was known to be mentally unbalanced before his episode at the store that he robbed.[11] Since the M'Naghten Rule first appeared in 1843, the law and psychiatry have engaged in an uneasy alliance in determining mental competence and responsibility for criminal acts. Many commentators have noted that

psychiatry by its definition, which blurs the distinction between good acts and bad acts, has no place in a courtroom where good and evil are starkly contrasted, just as the letter of the law is usually inappropriate in a psychiatrist's consulting office. Like oil and water, law and psychiatry do not mix well, if at all. The court feels certain that when the State of Georgia adopted the offense of guilty but mentally ill, its purpose was to take into consideration that many accused persons are mentally ill but unable to sustain an insanity defense. The rule seemed logical and was generally applauded by those involved in the criminal justice system. It appears, however, that the result has been to send some severely mentally disturbed people to the prison system immediately upon sentencing, where the authorities are generally ill-equipped to deal with them. Although this court finds that those in supervisory roles in the instant case did all that was required to shield them from a 1983 claim, the court in all candor feels compelled to say that the present situation (or the situation in effect in 1984) is inadequate to fully care for people like Timmy Waldrop and carry out the intent of O.C.G.A. § 17-7-131.[12] There needs to be some better plan for recognizing severe mental disorders upon sentencing. The prisoner then should be provided

---

11. According to Plaintiffs, both the convenience store clerk and the Grady County Sheriff knew Waldrop and knew that he was mentally ill. Apparently, the clerk was not alarmed when Waldrop walked into the store with a shotgun. After Waldrop told her it was a hold-up, she tried to persuade him not to rob the store, but she was unsuccessful. She gave Waldrop $25.00, and he left the store. Following the robbery, Waldrop came home and then left again for a short time. When he returned, the Sheriff was at his home and arrested him. The Sheriff who arrested Waldrop said, "Timmy needs some treatment for his mental condition. He is not mean, he's mentally sick." Plaintiffs' Statement of Facts of Case, ¶ 7. The evidence shows that Waldrop had been drinking and using illegal drugs prior to robbing the convenience store.

12. The "guilty but mentally ill" provision of Georgia law is found in O.C.G.A. § 17-7-131. This statute allows a defendant either to enter a plea of guilty but mentally ill before trial, or to be found guilty but mentally ill at trial. The application of the guilty but mentally ill statute leaves untouched the substantive right to the

insanity plea as an absolute defense. *Kirkland v. State,* 166 Ga.App. 478, 481-82, 304 S.E.2d 561, 565 (1983).

This court notes, however, that section 17-7-131 seems to draw a distinction between pleading guilty but mentally ill before trial and being found guilty but mentally ill at trial. Subsection (g)(1) states that a defendant who pleads guilty but mentally ill shall be sentenced in the same manner as a defendant who is found guilty to that effect at trial. This subsection goes on to state, however, that a defendant who is found guilty but mentally ill at trial "shall be evaluated by a psychiatrist or a licensed psychologist from the Department of Human Resources after sentencing and *prior to* transfer to a Department of Corrections facility." O.C.G.A. § 17-7-131 (Supp.1987) (emphasis added). The statute goes further in setting forth certain procedures to be adhered to following the evaluation of a defendant who has been found guilty but mentally ill at trial. The statute, however, fails to provide the same procedures for those who plead guilty but mentally ill before trial. Indeed, after making a distinction between pleading guilty but mentally ill and being found

with adequate treatment consistent with his needs. It seems obvious that if O.C.G. A. § 17–7–131 is to have any real meaning, those sentenced under its language should be sent first to a hospital of some sort for a period long enough for a proper evaluation to be made and then sent to the prison system with adequate safeguards to prevent the type of tragedies that happened in the instant case. If those who plead the insanity defense successfully often seem to unjustly escape punishment for their crime and pose a threat to society at large, then it must be admitted that any change in the criminal law to prevent the abuses of the insanity defense must be carried out in such a manner as to protect the genuinely mentally ill person from harming another or, as in this case, himself.

In summary, the court denies summary judgment as to all Defendants on the issue of qualified immunity. As to the issue of deliberate indifference under section 1983, the court grants summary judgment in favor of Defendant David C. Evans, Defendant Ralph Kemp, Defendant L.D. Evans, Defendant Albert Duncan, Defendant William Hopkins, Defendant R.T. Oliver, Defendant Henry Robinson, Defendant Charles Meyer, and Defendant Mitchell Sowell, and the court denies summary judgment as to Defendant Fodor and Defendant Smith. Further, the court dismisses without prejudice the pendent state law claims against those Defendants who have been granted summary judgment, and the pendent state claims against Defendants Fodor and Smith are carried with the case. Finally, Defendants Fodor and Smith have the opportunity of immediate appeal to the Eleventh Circuit Court of Appeals on the issue of qualified immunity.

guilty but mentally ill, the statute states only that those who have been found guilty but mentally ill at trial shall receive a psychiatric evaluation before being transferred into the state prison system.

This court notes that the legislature's failure to provide for pre-transfer evaluations to those who have pleaded guilty but mentally ill may

have resulted in the tragedies that occurred in the case presently before this court. The court is of the opinion that such evaluations should be provided to those who enter a plea before trial, or at the very least, that those defendants who enter such a plea should be sent to the medical institution in Augusta for a period of time before being placed in a prison facility.